UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NPF RACING STABLES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 6216 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| YESENIA G. AGUIRRE, individually and d/b/a Cuadra El Fenix, EL FENIX INC., RANCHO EL FENIX INC., CARLA LLERENAS, BENJAMIN HERNANDEZ, and HECTOR RODRIGUEZ, individually and d/b/a Cuadra La Araña, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

NPF Racing Stables, LLC, a horse racing company, brings this suit against Yesenia Aguirre, El Fenix Inc., Rancho El Fenix Inc., Carla Llerenas, Benjamin Hernandez, and Hector Rodriguez, alleging that Aguirre defrauded, embezzled from, and breached her fiduciary duties to NPF while she was its CEO, and that after NPF manager Karl Schieneman terminated Aguirre as CEO and bought out her membership in the LLC, Defendants took possession of, and have continued to use and profit from, NPF's horses and equipment. Doc. 29. In February 2019, NPF moved for a writ of replevin as to two of the horses, a starting gate, a Chevy truck, and a Ford tractor. Doc. 64. The court granted the motion, Docs. 80-81, and the horses and equipment were replevied on April 10, 2019, Doc. 104.

Meanwhile, NPF moved for a temporary restraining order prohibiting Defendants from "selling, leasing, encumbering, or otherwise moving or dissipating" other horses and equipment, Doc. 71, which NPF identified in an unsworn list as forty-five horses and twenty-eight pieces of equipment, Doc. 71-1. The court granted the motion and issued a temporary restraining order on

1

March 13, 2019. Docs. 75-76. NPF then sought and obtained an extension of the order until April 10, 2019. Docs. 83, 91.

NPF now moves for a preliminary injunction prohibiting Defendants from "selling, leasing, otherwise encumbering, or physically moving" the same horses and equipment and from racing the horses. Doc. 92; *see* Doc. 92-1 (listing the equipment and horses). During a hearing at which neither side presented testimony, Doc. 128, Defendants agreed to entry of a preliminary injunction as to the equipment but continued to oppose relief as to the horses.

## Preliminary Factual Findings

### A. NPF's Formation and Aguirre's Alleged Capital Contributions

Aguirre and Schieneman formed NPF in October 2017. Doc. 47 at ¶ 220; Doc. 92-2 at ¶ 3; Doc. 118-1 at ¶ 19. Schieneman drafted, and he and Aguirre signed, a Limited Liability Company Agreement of NPF Racing Stables, LLC (the "Operating Agreement"). Doc. 92-2 at ¶ 3; Doc. 118-1 at ¶ 19; Doc. 126-1 at ¶ 8. The Operating Agreement designated Schieneman as NPF's manager, Doc. 92-2 at ¶ 2; Doc. 92-3 at p. 48, and he appointed Aguirre as CEO, Doc. 47 at ¶ 20; Doc. 126-1 at ¶ 9; Doc. 92-3 at p. 47. Schedule A to the Agreement identifies Aguirre and Schieneman as the LLC's only members, each with an equal share of the company. Doc. 92-3 at pp. 24-25, § 7.1.4; *id.* at p. 47.

Aguirre admits that she contributed certain horses to NPF. Doc. 47 at ¶¶ 2, 93. The parties dispute, however, whether the Operating Agreement executed by Aguirre and Schieneman includes a list, labeled Exhibit C, purporting to set forth the horses that Aguirre contributed. The copy of the Agreement attached to Schieneman's declaration, which he avers is "true and authentic," includes Exhibit C. Doc. 92-2 at ¶ 3; Doc. 92-3 at pp. 49-50. But the court finds on the preliminary injunction record that Exhibit C likely was not part of the executed Agreement, and therefore that it does not reflect which horses Aguirre contributed to NPF.

According to Exhibit C, Aguirre contributed nineteen horses identified by name and age. Doc. 92-3 at pp. 49-50. Aguirre avers that Exhibit C was not attached to the Operating Agreement she signed. Doc. 118-1 at ¶ 19. In a reply declaration, Schieneman does not dispute Aguirre's assertion; instead, he avers that when preparing the Agreement, he and Aguirre "discussed the horses that [her previous business partner] had abandoned and for which NPF assumed the ownership and care," and that he "typed the names of the horses provided by Ms. Aguirre for an Exhibit C to the Operating Agreement listing the horses and other assets contributed to the company." Doc. 126-1 at ¶ 8. Tellingly, Schieneman does not say *when* he typed that list or whether it was part of the Agreement that Aguirre signed.

The undisputed contents of the Operating Agreement—the table of contents, body, and Exhibits A and B—cast further doubt on NPF's contention that Exhibit C was part of the Agreement signed by Aguirre. The table of contents lists "Exhibit A—Schedule of Members and Capitalization" and "Exhibit B—Manager," but does not mention an Exhibit C. Doc. 92-3 at p. 8. Nor does the body of the Agreement refer to an Exhibit C. Instead, Sections 7.1.4 and 7.1.5 provide that members' units and capital contributions "are as set forth on Schedule A" and that "[t]he Manager shall amend Exhibit A from time to time as necessary to reflect changes," including "the making of additional Capital Contributions." *Id*. at pp. 24-25, §§ 7.1.4-.5. The signature page contains a "Schedule A" titled "Schedule of Members and Capitalization," which lists the number of units assigned to each member, but (contrary to Section 7.1.4) does not set out their respective capital contributions. *Id*. at p. 47 (capitalization altered). That page is followed by an Exhibit B, titled "Manager." *Id*. at p. 48. The purported Exhibit C (titled "Initial Capital Contributions") states that Schieneman "is contributing cash used to purchase supplies and horses during the period in which [NPF's] formation was being

3

contemplated," sets out a list of Schieneman's cash contributions, and then states that Aguirre "is contributing the following horses," whose names are typed in a different font from the rest of the Agreement. *Id*. at pp. 49-50. The list does not include Junos Blue Boy, even though NPF alleges that that horse was "named as [a] contribution[]" and Defendants admit that Aguirre "contributed [the horse] to the NPF Agreement." *Ibid*.; Doc. 47 at ¶ 93.

Considering all the circumstances—Aguirre's denial that the Agreement she signed had an Exhibit C, Schieneman's evasive reply declaration, the lack of any reference to an Exhibit C in the Agreement's table of contents or body, the Agreement's contemplating that Exhibit A will list capital contributions, and the undisputed inaccuracy of the list of horses supposedly contributed by Aguirre—Exhibit C was likely not part of the Agreement that Aguirre signed.

   **B.**  **Aguirre's Alleged Purchase of Horses Under False Pretenses**

In November 2017, shortly after she and Schieneman formed NPF, Aguirre purchased two of the disputed horses, LK Fantastic Perk and BR Sweet Sensation, at an auction. Doc. 92-2 at ¶ 9; Doc. 92-4 at 2-6. Schieneman avers that two days before the auction, he gave Aguirre $12,000 that she said she would use to pay a fine from the Indiana Horse Racing Commission and certain medical expenses. Doc. 92-2 at ¶ 9. Nothing in the record suggests that the $12,000 was NPF's money as opposed to Schieneman's personal money. And NPF points to no evidence other than the timing of Aguirre's request for money and her purchases of the two horses to support its insinuation that Aguirre used some of the money to buy the horses rather than for the purposes she gave to Schieneman. Doc. 92 at 6.

   **C.**  **The Asset Purchase Agreement**

Until Summer 2018, NPF operated its business on a property in Grant Park, Illinois called El Palomino Ranch under an unwritten agreement with the property's owner. Doc. 118-1 at ¶¶ 2, 21. On July 31, 2018, El Fenix, which Aguirre controls, purchased El Palomino Ranch's real

4

property. *Id*. at ¶¶ 2, 23; Doc. 92-4 at 31-33. Schieneman made a mortgage loan of $642,000 to El Fenix and Aguirre, which enabled El Fenix to purchase the real property. Doc. 118-1 at ¶ 23; Doc. 92-4 at 34-37.

On August 3, NPF entered into an Asset Purchase Agreement with Sacramento Chavez, who had operated a horse event business on the property. Doc. 92-2 at ¶ 13; Doc. 92-4 at 11-27; Doc. 118-1 at ¶¶ 21, 23. In that Agreement, NPF purchased Chavez's business, including certain equipment at issue here. Doc. 92-4 at p. 12, § 1.1; *id*. at p. 19, art. IX; *id*. at p. 23.

### D. Aguirre's Termination as CEO and Removal from Membership in NPF

On August 15, 2018, Schieneman informed Aguirre via text that he was terminating her as NPF's CEO, citing her "lack of good faith and financial improprieties." Doc. 126-2 at 13; Doc. 126-1 at ¶ 13. On September 7, Schieneman sent Aguirre a letter "confirm[ing] that the termination of [her] employment from [NPF] was 'for Cause' under the" Operating Agreement, giving notice that NPF was exercising its option under the Agreement to buy out her membership for $5.00, and enclosing a check in that amount. Doc. 126-2 at 15-18; Doc. 126-1 at ¶ 13; *see* Doc. 92-3 at p. 43, § 17.1 (Operating Agreement providing that NPF "shall have a call upon the Units of each Member that the Company may exercise by giving written notice thereof to the affected Member … upon the occurrence of one or more of the following: … (ii) the termination of the Member's employment with the Company for Cause or the Member voluntarily terminates his or her employment with the Company"); *id*. at p. 43, § 17.2 ("The purchase price per Unit for the Units purchased pursuant to Section 17.1 shall be equal to the fair market value of the Units set by the Manager, in his sole and absolute discretion; provided that if the call option arises pursuant to clause (ii) of Section 17.1, then the purchase price per Unit of the Units shall be equal to $.01 per Unit.").

### E. The "NPF Horses" List

In his August 15, 2018 text terminating Aguirre as NPF's CEO, Schieneman asked for "the locations of all NPF horses listed in the Operating Agreement, paid for by NPF and maintained by NPF." Doc. 126-2 at 13. On August 21, Aguirre sent Schieneman a handwritten list, titled "NPF Horses," of thirty-five horses' names, locations, trainers, caretakers, and purchase prices. Doc. 92-4 at 42; Doc. 92-2 at ¶ 16. Schieneman avers that Aguirre sent the list as part of a text message exchange and described it as "an updated list of 35 horses (38 including foals in utero) identified as 'NPF Horses.'" Doc. 92-2 at ¶ 16. The text messages themselves are not in the record.

On August 23, Schieneman emailed Aguirre a spreadsheet purportedly listing "the horses we have identified you have had involvement with" and asked that she "fill in the blanks we have provided." Doc. 118-17 at 2-3. Aguirre responded:

> [W]e sent you a picture with the list of the horses that we have. I don't know why you are trying to dig through Facebook and find other horses. There is a lot of horses that are my friends that are not affiliated with npf, that maybe we took to the paddock but they are not mine. Horses that we took pictures of […] not necessarily mine. We will explain what happened to each horse briefly. Who owns them and where they are at, but you should have done this list by yourself a long time ago.

*Id*. at 2. Schieneman's spreadsheet is not in the record.

### F. The Disputed Horses and Equipment

NPF's preliminary injunction brief asserts that it owns the horses and equipment identified in an unsworn list attached as an exhibit to the brief. Doc. 92 at 1-2, 10-11; *see* Doc. 92-1 (NPF's list). That assertion is not evidence, and therefore cannot carry the day for present purposes. *See Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015) ("[A]ssertions in briefs are not evidence … ."); *In re Morris Paint & Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985) ("Arguments and factual assertions made by counsel in a brief, unsupported by affidavits, cannot

6

be given any weight."). In response to NPF's assertion, Aguirre submits a declaration attaching a list that, she avers, "reflects the status of all of the horses identified in" NPF's list "based upon [her] personal knowledge, best recollection," and review of business records. Doc. 118-1 at ¶ 34; *see* Doc. 118-16 (Aguirre's list). In her declaration and list, Aguirre concedes that NPF owns four of the disputed horses on NPF's list—Junos Blue Boy, Skye Fire, So Tempted, and Switch to a Corona—but denies that NPF owns the others and even avers that some of the horses do not exist. Doc. 118-16 at 3-4.

        G.        **Defendants' Financial Condition**

On March 1, 2019, Defendants' previous counsel moved to withdraw, asserting in pertinent part that Defendants "have not been able to pay for continued representation for several months." Doc. 67 at ¶ 3. The court granted the motion on March 7, 2019. Doc. 73. On March 29, 2019, Defendants moved to stay this case. Doc. 89. The motion represented that for the two prior months, Defendants had "depended on loans from family and friends, volunteer work, and longer strenuous hours of work" to cover the costs of caring for the horses and defending this suit, and that they lost their counsel "because [their] priority has been to focus on the well being of all the animals in the farm." *Id*. at ¶¶ 4-6. New counsel appeared for Aguirre, El Fenix, and Rancho El Fenix on April 18, 2019, and for Llerenas on May 3, 2019. Docs. 106-111, 121-123. Rodriguez and Hernandez remain *pro se*. Docs. 87-88.

Aguirre avers that El Palomino Ranch and the horses "cost around $30,000 to $35,000 per month to operate and maintain," including the costs of food, bedding, training, grooming, medical care, maintenance, and taxes. Doc. 118-1 at ¶ 33. She also avers that El Fenix has made three mortgage payments of $21,481.27 to Schieneman since August 2018. *Ibid*. The record does not contain evidence of Defendants' income or other expenses.

7

**Discussion**

"To win a preliminary injunction, the moving party must establish that (1) without preliminary relief, it will suffer irreparable harm before final resolution of its claims; (2) legal remedies are inadequate; and (3) its claim has some likelihood of success on the merits." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018). "If the moving party makes this showing, the court balances the harms to the moving party, other parties, and the public." *Ibid*. "In so doing, the court employs a sliding scale approach: the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in [its] favor; the less likely [it] is to win, the more need [the balance] weigh in [its] favor." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018) (alteration and internal quotation marks omitted). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 678 (7th Cir. 2012) (internal quotation marks omitted). "Stated another way, the district court sits as would a chancellor in equity and weighs all the factors, seeking at all times to minimize the costs of being mistaken." *Ibid*. (alteration and internal quotation marks omitted).

As noted, Defendants do not contest a preliminary injunction as to the equipment. The only dispute concerns whether a preliminary injunction should issue as to the horses.

**I.  Likelihood of Success on the Merits**

The parties agree that NPF's likelihood of success on the merits turns on the likelihood that it owns the horses. Doc. 92 at 10-11; Doc. 118 at 15-18. Because Defendants admit in their answer that NPF owns Joey Mercury, Doc. 47 at ¶¶ 44, 85, 174-175, and in their preliminary injunction response that NPF owns Junos Blue Boy, Skye Fire, So Tempted, and Switch to a Corona, Doc. 118-16 at 3-4, NPF has established a likelihood of success on the merits as to those

8

five horses. NPF argues that it is likely to succeed on the merits as to the remaining horses because: (1) Aguirre contributed some of those horses to NPF, as evidenced by the purported Exhibit C to the Operating Agreement; (2) NPF later purchased or acquired additional horses; and (3) Aguirre "sent a list of 'NPF Horses' to [Schieneman] on August 21, 2018," which NPF claims is an admission that it owns the listed horses. Doc. 92 at 11. None of these theories is supported by the record.

First, as noted above, the record does not support NPF's contention that Exhibit C was part of the Operating Agreement that Aguirre signed. Accordingly, NPF has not shown a likelihood of success on the merits as to its contention that Aguirre contributed to NPF the horses listed in Exhibit C.

Second, although NPF asserts that "[o]ther[] [horses] were purchased or acquired" after the company's formation, it does not identify the horses to which it refers or cite anything in the record to support the proposition that it owns them. *Ibid*. NPF has thus forfeited the point for purposes of this motion. *See M.G. Skinner & Assocs. Ins. Agency v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

Third, Aguirre's August 21, 2018 handwritten "NPF Horses" list does not show that NPF likely owns the listed horses. Schieneman's and Aguirre's communications about the list leave ambiguous whether Aguirre listed only the horses she believed NPF *owned*, or whether she also listed horses owned by others but "paid for" or "maintained by NPF," or horses "listed in the Operating Agreement" but no longer owned by NPF. Doc. 126-2 at 13. The contents of the list undermine the notion that it reflected which horses NPF owned as of August 2018, as Nos. 6, 8, 30, 31, and 35 identify dead horses, and No. 26 lists Forego's trainer as "Luis [Davila] (owns

9

him)." Doc. 92-4 at 42. Moreover, NPF implicitly acknowledges that Aguirre's list does not accurately reflect which horses it owns, for NPF's own list, Doc. 92-1 at 1-3, without any explanation, does not include six living horses on Aguirre's list (Nos. 2, 4, 5, 18, 22, and 26), Doc. 92-4 at 42. Accordingly, NPF has not shown a likelihood of success as to its contention that it owns the horses identified on Aguirre's handwritten list.

At the preliminary injunction hearing, NPF argued that it has shown a likelihood of success on the merits as to any horses that Aguirre purchased using money she allegedly obtained from Schieneman under false pretenses, reasoning that it is entitled to a constructive trust over assets that Aguirre fraudulently obtained. Doc. 128; *see* Doc. 92 at 6 (asserting that Schieneman gave Aguirre money to pay for personal medical expenses and a fine, and that Aguirre purchased two horses shortly thereafter). NPF has forfeited this theory by failing to press it in its briefs. *See Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 863 (7th Cir. 2015) ("Arguments that are raised for the first time in oral argument are forfeited."). In any event, the only evidence NPF cites to support its constructive trust theory is Schieneman's averment that *he*—not NPF—gave Aguirre money in reliance on her representation as to how she would spend it. Thus, if anyone is entitled to a constructive trust, it would be Schieneman, a non-party, and not NPF, the party movant. *See Dexia Crédit Local v. Rogan*, 629 F.3d 612, 630 (7th Cir. 2010) ("Under Illinois law, a constructive trust is imposed to prevent unjust enrichment by imposing a duty on the person receiving the benefit to convey the property back to the person from whom it was received."); *Blumenthal v. Brewer*, 69 N.E.3d 834, 848 (Ill. 2016) ("A constructive trust is an equitable remedy, which may be imposed where the person in possession of the property would be unjustly enriched if he or she were permitted to retain that property. The sole duty of the constructive trustee is to transfer title and possession of the wrongfully

acquired property to the beneficiary.") (citation omitted). NPF's constructive trust theory therefore does not establish a likelihood of success on the merits as to the ownership of any horses.

For their part, Defendants contend that even as to the horses indisputably belonging to NPF, NPF cannot show a likelihood of success on the merits because: (1) "Schieneman fraudulently induced Aguirre into agreeing to form NPF in the first place" and established NPF "in violation of [his] fiduciary duties to Aguirre," making the LLC void ab initio; and (2) Aguirre's termination as CEO and removal as an LLC member were improper, so she "should be deemed to retain her ownership interest in any property claimed to be owned by NPF." Doc. 118 at 15-17. Defendants have forfeited the first argument for purposes of this motion by acknowledging NPF's existence as an LLC throughout their answer without any suggestion that it was invalid, *e.g.*, Doc. 47 at ¶¶ 1-2 (admitting that NPF was formed in 2017 and that Aguirre made capital contributions, and "demand[ing] that Aguirre's contribution be credited to her"); *id*. at ¶ 220 (admitting that Aguirre entered into the Operating Agreement on October 25, 2017), and by failing to plead an affirmative defense attacking the LLC's validity. *See* Fed. R. Civ. P. 8(c)(1) ("In response to a pleading, a party must affirmatively state any avoidance or affirmative defense … ."); *Bell v. Taylor*, 827 F.3d 699, 705 (7th Cir. 2016) ("[A]n affirmative defense is a defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's claim, even if all the allegations in the complaint are true.") (alterations and internal quotation marks omitted); *Gabarick v. Laurin Mar. (Am.) Inc.*, 753 F.3d 550, 554 (5th Cir. 2014) (characterizing as an affirmative defense the argument that charter agreements were void ab initio); *Bank of Miss. v. Knight*, 208 F.3d 514, 517 (5th Cir. 2000) (holding that "the alleged voidness of [a] judgment constituted an avoidance or affirmative defense"). And Defendants

have forfeited the second argument by failing to cite any record evidence or legal authority supporting either the proposition that Aguirre's removal as a member of NPF was improper or the proposition that the appropriate remedy for such a wrongful removal is to reinstate her ownership interest in NPF's property. *See M.G. Skinner*, 845 F.3d at 321.

In sum, NPF has established a likelihood of success as to the five horses Defendants admit belong to NPF, but not as to the other horses.

## II. Adequacy of Legal Remedies and Irreparable Harm

NPF argues that it has no adequate remedy at law and will suffer irreparable harm absent an injunction as to those five horses because, given Defendants' inability to pay their previous counsel's legal bills, Defendants are unlikely to be able to satisfy a money judgment, leaving NPF without a remedy unless it can recover the horses. Doc. 92 at 11-12. Specifically, NPF is concerned that if Defendants remain free to race the five horses—with the attendant risk of their injury or death—there is a significant risk of irreparable harm. *Id*. at 2, 11-12.

Although a party seeking a preliminary injunction must show "more than a mere possibility of harm," the harm need not "actually occur before injunctive relief is warranted" or "be certain to occur before a court may grant relief on the merits." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044-45 (7th Cir. 2017). "Rather, harm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial." *Ibid*. (internal quotation marks omitted). As Defendants acknowledge, Doc. 118 at 18-20, the risk that a defendant will become insolvent before the plaintiff can collect damages "is a standard ground for concluding" that the plaintiff lacks an adequate remedy at law and will suffer irreparable harm without an injunction. *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 596 (7th Cir. 1986); *see also Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S., Inc.*, 549 F.3d 1079, 1095 n.8 (7th Cir. 2008) (noting that the plaintiff may lack an adequate

legal remedy if it "would be unable to collect damages from the defendant at a later time because of the defendant's subsequent insolvency"). Defendants submit, however, that NPF has not proved that they are or soon will be insolvent. Doc. 118 at 19-20.

NPF has the stronger argument on this matter. Defendants' previous counsel withdrew in March 2019 after asserting that Defendants "ha[d] not been able to pay for continued representation for several months." Doc. 67 at ¶ 3; Doc. 73. Defendants then sought to stay the case in part because they were "depend[ing] on loans from family and friends, volunteer work, and longer strenuous hours of work" to care for the horses and thus could not afford counsel. Doc. 89 at ¶¶ 4-6. True, those assertions are statements in briefs, not evidence, *see Mitze*, 782 F.3d at 882, and the only financial evidence of record is Aguirre's averment that the ranch and horses "cost around $30,000 to $35,000 per month to operate and maintain" and that El Fenix has made mortgage payments totaling about $64,000 since August 2018, Doc. 118-1 at ¶ 33. But the lack of evidence is a problem of Defendants' own making, for at the time of the evidentiary hearing, they had not yet produced the financial records requested by NPF in discovery. Thus, what little information is available supports NPF's position that there is a substantial risk that Defendants will be unable to pay damages.

In any event, racehorses are individual, sentient animals, not fungible, inanimate property. NPF has a likelihood of success on the merits as to five horses that Defendants admit are owned by NPF. As compared to recovering those specific horses, NPF would be meaningfully worse off—and thus irreparably harmed—if Defendants were permitted to race any of those horses, the horse suffered injury or death, and NPF's only remedy were to collect money it might use to buy a different horse. *See Kinderhill Select Bloodstock, Inc. v. United States*, 835 F. Supp. 699, 700 (N.D.N.Y. 1993) ("Because [the plaintiffs'] goal is to have the horses returned

13

to them, and the horses are unique, money damages would not be an adequate remedy."); *see also Whitaker*, 858 F.3d at 1046 (holding that the movant has no adequate remedy at law when "any award would be seriously deficient as compared to the harm suffered") (internal quotation marks omitted).

**III.     Balance of Harms and Public Interest**

NPF contends that the balance of harms weighs heavily in its favor because, absent an injunction, Defendants could sell or hide the five horses or race them at risk of injury or death, potentially leaving NPF unable to recover them. Doc. 92 at 12; Doc. 126 at 12-13. Defendants retort that NPF's asserted harm is hypothetical and compensable with money damages, and argue that enjoining them from moving or racing the horses would jeopardize their "ability to conduct[] their business during the season when they earn most of their money." Doc. 118 at 20-21.

In balancing the harms, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Valencia*, 883 F.3d at 966 (internal quotation marks omitted). Under the sliding scale approach, NPF's strong likelihood of success on the merits as to the five horses means that the balance of harms need only slightly tip in NPF's favor. *See ibid*.

The balance of harms weighs in NPF's favor as to those five horses. As discussed above, permitting Defendants to race the horses at risk of injury or death risks irreparably harming NPF because, although it could collect money damages if Defendants were solvent, the horses themselves are not fungible and therefore cannot be replaced. On Defendants' side of the ledger is losing the ability to generate revenue from racehorses they admit they do not own. Defendants neither explain nor cite authority for the proposition that the loss of potential revenues from using NPF's assets without its permission is a legally cognizable harm—much less that such a

14

harm would be irreparable—and thus have forfeited the point. *See M.G. Skinner*, 845 F.3d at 321. In any event, the equities plainly favor NPF, as granting an injunction would deprive Defendants only of the ability to profit from NPF's horses, while denying an injunction would risk permanently depriving NPF of its horses.

The public interest also weighs in favor of an injunction as to the horses NPF undisputedly owns. Protecting the safety of NPF's horses by preventing Defendants from racing them without permission would serve the public interest. By contrast, there is no public interest in allowing Defendants to profit from their unauthorized use of NPF's horses.

## Conclusion

NPF's motion for a preliminary injunction is granted in part and denied in part. By agreement, the motion is granted as to the equipment (listed at Doc. 92-1 at 3-4), so Defendants may not sell, lease, or encumber the equipment or physically remove any of it from El Palomino Ranch or wherever it is currently located—although, by agreement, Defendants may move the iPhone X. The motion also is granted as to horses Joey Mercury, Junos Blue Boy, Skye Fire, So Tempted, and Switch to a Corona, which Defendants may not race, sell, lease, encumber, or physically remove from El Palomino Ranch (or wherever they are currently stabled). The motion is otherwise denied.

NPF shall post an injunction bond of $10,000. Given the narrow scope of the injunction and the minimal evidence of Defendants' potential lost profits, the court finds a $10,000 bond sufficient "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002) ("The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision

caused him … ."). The injunction will take effect upon the bond's posting. *See BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 912 F.3d 1054, 1057 (7th Cir. 2019) ("Rule 65(c) makes the effectiveness of a preliminary injunction contingent on the bond having been posted.").

May 31, 2019

_____
United States District Judge