UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NPF RACING STABLES, LLC, ) | |
| ) | |
| Plaintiff, ) | 18 C 6216 |
| ) | |
| vs. ) | Judge Gary Feinerman |
| ) | |
| YESENIA G. AGUIRRE, individually and d/b/a Cuadra ) | |
| El Fenix, EL FENIX INC., RANCHO EL FENIX INC., ) | |
| BENJAMIN HERNANDEZ, HECTOR RODRIGUEZ, ) | |
| individually and d/b/a Cuadra La Araña, CARLA ) | |
| LLERENAS, JOSE LUIS DAVILA CAMPOS, JOSE ) | |
| JESUS VALENZUELA, CESAR CANO, and DAVID ) | |
| ARQUIMIDEZ HUICOCHEA-SILVA, d/b/a Adelante ) | |
| Design & Print, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| and ) | |
| ) | |
| YESENIA G. AGUIRRE, ) | |
| ) | |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| NPF RACING STABLES, LLC, ) | |
| ) | |
| Counter-Defendant ) | |
| ) | |
| and ) | |
| ) | |
| KARL SCHIENEMAN, ) | |
| ) | |
| Third-Party Defendant. ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

NPF Racing Stables, LLC, a horse racing company, brought this diversity suit against

Yesenia Aguirre, Al Fenix Inc., Rancho el Fenix Inc., Benjamin Hernandez, Hector Rodriguez,

Carla Llerenas, Jose Luis Davila Campos, Jose Jesus Valenzuela, Cesar Cano, and David

Arquimidez Huicochea-Silva, alleging that Aguirre defrauded, embezzled from, and breached her fiduciary duties to NPF while she was its CEO, and that after NPF manager Karl Schieneman terminated her as CEO and bought out her membership in the LLC, Defendants took possession of, and have continued to use and profit from, NPF's horses and equipment. Doc. 170. Aguirre brought counterclaims against NPF and third-party claims against Schieneman, alleging that he breached his fiduciary duties and that he and NPF violated the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*, and defamed her, and seeking damages and a declaration that the agreement governing her relationship with NPF is void. Doc. 147. NPF moves to dismiss the counterclaims and Schieneman moves to dismiss the third-party claims. Docs. 151, 183. The motions are denied.

## Background

In considering the motions to dismiss, the court assumes the truth of the counterclaims' and third-party claims' well-pleaded factual allegations, but not their legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the [counterclaims and third-party claims], documents that are critical to [those claims] and referred to in [them], and information that is subject to proper judicial notice," along with additional facts set forth in Aguirre's briefs opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Aguirre as those materials permit. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at this stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

Schieneman and Aguirre became romantically involved in or around 2013. Doc. 147 at ¶ 6. Schieneman remained married but repeatedly promised Aguirre that he would divorce his wife. *Id*. at ¶ 12. Aguirre loved horses, so Schieneman purchased her many horses as gifts, and he also provided her with money and handwritten tickets to be redeemed for gifts. *Id*. at ¶¶ 7-9. Schieneman encouraged Aguirre to abandon nursing school in order to pursue a business showing, training, and caring for horses. *Id*. at ¶ 10. Aguirre did so, beginning to build the business by acquiring horses, engaging in marketing, and developing relevant skills. *Id*. at ¶ 11. Schieneman's wife ultimately discovered the affair and his gifts to Aguirre. *Id*. at ¶¶ 12-18.

In December 2016, Aguirre learned that the owners of the Palomino Ranch, a horse racing and showing venue, were interested in selling. *Id*. at ¶ 20. Aguirre asked if Schieneman would lend her money to purchase the ranch, and he suggested that they instead act as partners, with Aguirre providing "sweat equity" and Schieneman providing financial support. *Id*. at ¶¶ 20-21. Some of the horses Schieneman had gifted Aguirre were put into the new venture. *Id*. at ¶ 22. Aguirre and Schieneman did not commit their partnership to writing until October 2017, but he repeatedly described them as "partners" or "business partners" prior to that time. *Id*. at ¶ 24.

Until shortly before this lawsuit was filed, Aguirre entrusted Schieneman with all legal issues concerning their business. *Id*. at ¶ 25. Schieneman trumpeted his legal savvy and acknowledged that he was acting as the lawyer for their business, and Aguirre sought and relied upon his legal knowledge and advice. *Id*. at ¶ 26. By late 2016, Schieneman acted as, and acknowledged that he was, the parties' business lawyer, and he also had acted as Aguirre's own lawyer in connection with unspecified matters. *Id*. at ¶ 27. By late 2016, Aguirre had ceded most control over financial and legal decision making to Schieneman, and he made most

financial decisions and all legal decisions on her behalf. *Id*. at ¶ 28. Schieneman did so knowing that Aguirre would rely on him and do as he instructed. *Ibid*.

 As time went on, Schieneman used his superior legal and business knowledge, together with the trust Aguirre placed in him, to gain control over her in the context of their romantic relationship. *Id*. at ¶ 29. In October 2017, Schieneman suggested that he and Aguirre form a limited liability company, which would eventually become NPF. *Id*. at ¶ 34. Schieneman took charge of preparing the necessary documents, including what the parties refer to as the "Operating Agreement." *Ibid*.

Aguirre trusted Schieneman to act as their lawyer in forming NPF and had no personal input into preparing the Operating Agreement. *Id*. at ¶ 35. Schieneman did not instruct Aguirre to obtain independent counsel about the Operating Agreement or related documents, nor did he advise her of their meaning or impact. *Id*. at ¶¶ 36, 95. Placing complete trust and confidence in Schieneman, and without reading or understanding them, Aguirre signed the Operating Agreement and other documents, which provided that NPF would be a member-managed LLC and that Schieneman would be its sole manager and wield expansive powers. *Id*. at ¶¶ 37-38, 96.

The Operating Agreement gave Schieneman the power to terminate Aguirre from her position as NPF's CEO, *id*. at ¶ 39; to force Aguirre out of NPF upon her termination with payment of only five dollars for her share of the company, should he determine he had cause to terminate her, *id*. at ¶ 40; and to bar Aguirre from pursuing related business ventures upon her termination, *id*. at ¶ 41. Schieneman's aim in crafting these provisions was to gain leverage over Aguirre in their business relationship, which he could use against her in the course of their romantic relationship. *Id*. at ¶¶ 42, 45. That aim was consistent with his behavior on past occasions when he threatened to terminate financial support or undermine their business if

Aguirre did not comply with his requests to, for instance, travel with him on a trip.  *Id*. at ¶¶ 43-44.

Although Aguirre worked multiple hours a day, Schieneman did not cause NPF to pay her.  *Id*. at ¶ 46.  At some point, Schieneman and Aguirre agreed that NPF would set up a payroll to pay her and hire more employees.  *Id*. at ¶ 47.  Schieneman and Aguirre agreed that NPF would pay her $800 per week to work eight hours per day, and she thereafter worked for NPF at least eight hours per day.  *Id*. at ¶¶ 47, 110-111.  At Schieneman's direction, NPF did not set up a payroll system or pay Aguirre for her work.  *Id* at ¶¶ 47, 111, 113.

Following execution of the Operating Agreement, Schieneman began funneling through NPF some of the money he continued to provide Aguirre and increasingly attempted to condition his support for the business on Aguirre showing him romantic affection.  *Id*. at ¶¶ 49-51.  Schieneman repeatedly threatened to leave her and the business without financial support or to seize the business in order to force Aguirre to act as he desired in the context of their romantic relationship.  *Id*. at ¶¶ 52, 55.

From an unspecified time until Summer 2018, Aguirre and NPF ran Palomino Ranch pursuant to an informal agreement with the owner of the land and the owner of the business and equipment.  *Id*. at ¶ 56.  In June 2018, Schieneman and Aguirre sent a Letter of Intent to Purchase Palomino Ranch.  *Id*. at ¶ 57.  An entity named EFI—apparently Rancho El Fenix Inc., a corporation for which Aguirre is the registered agent, Doc. 170 at ¶ 52, though Aguirre does not make that clear—purchased Palomino Ranch's real property on July 31, 2018.  Doc. 147 at ¶ 58.  Schieneman personally loaned Aguirre and EFI the purchase price pursuant to a mortgage he drafted, and he personally became the mortgagee.  *Id*. at ¶ 59.  Acting as an attorney, Schieneman drafted or helped to draft an Asset Purchase Agreement for NPF to acquire

Palomino Ranch's business assets. *Id.* at ¶ 60. Schieneman did not advise Aguirre or EFI to obtain independent legal advice. *Id.* at ¶ 61. Aguirre and EFI have made all payments due to Schieneman under the mortgage. *Id.* at ¶ 62.

In August 2018, Schieneman became increasingly volatile and made greater demands to spend time with Aguirre. *Id.* at ¶ 64. He pushed her to move in with him, *ibid.*, and demanded 20-30 hours of her time to work on issues related to, in his words, a "legal analysis of the risks I did serving as our lawyer," *id.* at ¶ 65.

At some point, when Aguirre did not respond immediately to a text message, Schieneman grew angry. *Id.* at ¶ 66. He later told her: "I honestly don't believe you love me. Never seeing someone is not a sign of love. My feelings are not enough. My support is not enough. I need to step away from this. Just like you step away from me all the time." *Ibid.* The following day, he wrote to Aguirre: "I asked Dan Blaney to help me unwind all of this to shut down NPF and El Palomino. You can move everything into El Fenix." *Id.* at ¶ 67. Later that evening, Schieneman wrote:

> I just spent 1.43 million at your request to prove my love, to protect you from
> … [Schieneman's wife] and that I would keep it private to the world until I
> was divorced. Then you did not move in or try. Someone in love would not
> do that. Tonight I am going to add up what I spent on you. It will become the
> Mortgage. I don't anticipate you can [ever] pay it back. My kids will likely
> inherit it. You pay me half the gate and liquor. Keep the rest. I will pay the
> taxes from that. The rest goes towards the Mortgage.

*Id.* at ¶ 68 (second and third alterations in original). Aguirre objected to this plan, and Schieneman threatened to file suit unless she paid more attention to and moved in with him. *Id.* at ¶¶ 69-70.

On August 12, 2018, Schieneman withdrew all the money in the NPF bank account, leaving Aguirre with no means to pay employees or expenses. *Id.* at ¶ 71. Schieneman also shut down all access to NPF's credit cards and bank accounts. *Id.* at ¶ 72. When Aguirre

complained, Schieneman told her that he would pay each employee personally and in person, and then texted her throughout the day concerning problems in their romantic relationship. *Id*. at ¶ 73. That evening, he said to Aguirre: "The fact is you put no money down and you think you own a ranch. What did you do to deserve that? And you did not keep your word and see if it worked by moving in. Which was the reason I bought it." *Id*. at ¶ 74.

Around the same time, Schieneman took possession of $250,000 in proceeds from recent events at Palomino Ranch to use for his own purposes, texting Aguirre that he "pulled the money because [she] did not move in[ with him]." *Id*. at ¶ 75. He then told Aguirre that she had no right to run races at the ranch and purported to fire her from her role as CEO. *Id*. at ¶ 76. He also prepared and had Palomino Ranch's former owners sign what Aguirre calls the "Phony Lease," which he then used to file suit in order to prevent EFI from putting on a scheduled event. *Id*. at ¶¶ 80-87.

Since then, Schieneman has privately and publicly contacted Aguirre's associates, family, colleagues, and customers, as well as members of the Mexican-American community, in order to interfere with her business and the operations of Palomino Ranch and to cast Aguirre and the ranch in disrepute. *Id*. at ¶ 89. Aguirre identifies six statements Schieneman published on NPF's website that are allegedly defamatory: (1) a section entitled "The great lie," which states that Aguirre "lied" to Schieneman about ownership of the horses; (2) "Here is an example of two great lies [made by Aquirre [sic]] that we have discovered"; (3) "The second lie [made by Aquirre [sic]] was huge. It caused us to start NPF together. …"; (4) "[R]ead the detail Yesenia Aguirre used in her lies to me about her the [sic] divorce which left her needing my sudden investment in her horses. Of course none of this is true except she needed money badly"; (5) "[W]e are sure that the record in the litigation shows many lies and actions of self-negotiation

that our former President Yesenia Aguirre performed. … [R]acing horses that do not belong to her, eliminating NPF from El Palomino, and ignoring the rights of NPF in the assets for which I contributed all the money and these are only some of the examples"; and (6) "[T]wo months after the ranch [was] bought[,] the business relationship and personal relationship ended[,] and NPF sued Yesenia Aguirre for numerous behaviors of self-dealing and mismanagement which continues until now while she races horses that do not belong to the Ranch that she did not contribute any money to." *Id.* at ¶ 60 (alterations in original). Those statements were false, and NPF and Schieneman published them with either knowledge of their falsity or reckless disregard for their truth. *Id.* at ¶¶ 90-91, 118. NPF and Schieneman made similar or identical statements by other means of communication and with similar intent to Aguirre's family, colleagues, and customers, and to members of the Mexican-American community. *Id.* at ¶ 92.

## Discussion

Aguirre seeks a declaration that the Operating Agreement is void. She also seeks damages against Schieneman for breach of fiduciary duty and against Schieneman and NPF for violations of the IWPCA and for defamation.

## I.     Declaratory Judgment Claim and Fiduciary Duty Claim

Aguirre argues that Schieneman owed her a fiduciary duty as her attorney, her business partner, NPF's manager, and member of NPF. Doc. 162 at 3-7; Doc. 211 at 3-11. Based on a theory of presumed fraud arising from Schieneman's breach of fiduciary duty, Aguirre seeks a declaration that the Operating Agreement is void and damages for that breach. Doc. 147 at ¶¶ 93-105. Because Aguirre adequately pleads the existence of an attorney-client relationship between her and Schieneman and a breach of his resulting fiduciary duties, there is no need at this stage to reach her other proposed bases for alleging a fiduciary duty and breaches thereof.

"[T]he existence of an attorney-client relationship creates a fiduciary relationship between those parties as a matter of law." *In re Imming*, 545 N.E.2d 715, 721 (Ill. 1989). The existence of such a relationship "is not dependent upon the payment of fees nor … upon the execution of a formal contract." *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1317 (7th Cir. 1978). Nonetheless, "[t]o form an attorney-client relationship, both the attorney and the client must consent to its formation," with "[c]onsent [being either] express or implied." *Meriturn Partners, LLC v. Banner & Witcoff, Ltd.*, 31 N.E.3d 451, 455 (Ill. App. 2015). For instance, "if an attorney knows that a person is relying on his performance of services and he performs for that person's benefit without limitation, an attorney-client relationship can be found." *Id.* at 456; *see also Rubin & Norris, LLC v. Panzarella*, 51 N.E.3d 879, 891 (Ill. App. 2016) ("[The attorney-client relationship's] formation hinges upon the putative client's manifested intention to seek professional legal advice and [her] reasonable belief that [s]he is consulting a lawyer in that capacity.") (citing *Westinghouse*, 580 F.2d at 1319). "[T]he analysis focuses on the client's viewpoint rather than that of the attorney." *Rubin & Norris*, 51 N.E.3d at 891. That said, a "client cannot unilaterally create the relationship, and the putative client's belief that the attorney is representing [her] is only one consideration." *Meriturn Partners*, 31 N.E.3d at 456.

A lawyer owes specific duties of "fidelity, honesty, and good faith in both the discharge of contractual obligations to, and professional dealings with, a client." *Doe v. Roe*, 681 N.E.2d 640, 645 (Ill. App. 1997). "Self-dealing, conflicts of interest, or even divided loyalties are inconsistent with fiduciary responsibilities." *Howell v. Motorola, Inc.*, 633 F.3d 552, 566 (7th Cir. 2011). "The mere existence of a fiduciary relationship prohibits the agent from seeking or obtaining any selfish benefit for himself, and if the agent does so, the transaction is presumed to

be fraudulent." *Spring Valley Nursing Ctr., L.P. v. Allen*, 977 N.E.2d 1230, 1233 (Ill. App. 2012); *see also Doe*, 681 N.E.2d at 645 ("When, in the course of his professional dealings with a client, an attorney places personal interests above the interests of the client, the attorney is in breach of his fiduciary duty by reason of the conflict."); *LaSalle Nat'l Tr., N.A. v. Bd. of Dirs. of the 1100 Lake Shore Dr. Condo.*, 677 N.E.2d 1378, 1383 (Ill. App. 1997) ("Constructive fraud does not require actual dishonesty or intent to deceive. In a fiduciary relationship, where there is a breach of a legal or equitable duty, a presumption of fraud arises.") (internal quotation marks omitted). "The presumption of fraud … is not conclusive and may be rebutted by clear and convincing evidence to the contrary." *Spring Valley Nursing Ctr.*, 977 N.E.2d at 1234. "Some of the significant factors to be considered in determining if the presumption of fraud has been rebutted include whether the fiduciary made a frank disclosure to the principal of the information he had, whether the fiduciary paid adequate consideration, and whether the principal had competent and independent advice." *Ibid*.

When a fraud claim depends on the existence of an attorney-client or other fiduciary relationship, the existence of that relationship need not be pleaded with particularity. Although "Illinois requires that the facts from which the fiduciary relationship arises be pleaded and proved by clear and convincing evidence … [,] federal pleading standards apply when considering a motion to dismiss a [counterclaim in a case] that rests on diversity jurisdiction." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 782 n.5 (7th Cir. 2015) (internal quotation marks omitted). Accordingly, Aguirre "only need[s] to plead facts that plausibly state[] a claim for relief arising out of [Schieneman]'s violation of a fiduciary duty." *Ibid*; *see also Firestone v. Firestone*, 76 F.3d 1205, 1211 (D.C. Cir. 1996) ("The reasons behind the particularity requirement—protecting a defendant from reputational harm and 'strike' suits, and providing

defendant sufficient information to respond to plaintiff's claims—apply with less force to the specific question of the existence of a fiduciary relationship. A defendant is unlikely to experience any embarrassment from allegations of the existence of a fiduciary relationship.") (citation omitted); *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) ("[T]he circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage.").

Aguirre alleges that she entrusted Schieneman as to all legal issues concerning their business dealings, that she relied on his legal knowledge and advice, and that he "trumpeted … his legal savvy" and acknowledged that he was acting as the lawyer for their business. Doc. 147 at ¶¶ 25-28. Because Schieneman provided the relevant advice during the pair's contemplation of the NPF business and did so in order to structure their respective interests in and relationship to the business, it is not possible, at least at the pleading stage, to separate his personal legal advice to Aguirre from his legal advice to the business. Aguirre's allegations give rise to the permissible inference that Schieneman had good reason to believe that she was relying on his legal advice to protect her personal interests in the formation of NPF.

Indeed, in arguing that he and Aguirre were not business partners, Schieneman confirms that she has adequately alleged that he served as her personal attorney. Specifically, Schieneman contends that the pair did not operate a business together until the Operating Agreement was executed. Doc. 223 at 5-7. Yet he simultaneously and contradictorily maintains that, even though he provided legal services to Aguirre prior to executing the Operating Agreement, he provided such advice only to the business, not to Aguirre personally. Schieneman cannot simultaneously maintain (1) that no separate business entity existed prior to the Operating Agreement *and* (2) that legal advice he provided prior to the Operating Agreement was only to

that then-non-existent business.  Given all this, Aguirre has adequately pleaded the existence of an attorney-client relationship.

Aguirre also adequately alleges that Schieneman breached his fiduciary duties to her. Schieneman did not instruct Aguirre to obtain independent counsel or otherwise advise her of the consequences of signing the Operating Agreement.  Doc. 147 at ¶¶ 36-37, 95-96.  The agreement provided him with significant power over both the company and Aguirre's role, which he intended to use to provide him personal advantage and leverage in their romantic relationship. *Id*. at ¶¶ 38-42.  Those self-serving actions and significant failures to disclose and explain the legal consequences of signing the agreement are enough, at this stage, for Aguirre to have alleged a breach of Schieneman's fiduciary duties.  *See Doe*, 681 N.E.2d at 646 (holding that an attorney who had been involved in a sexual relationship with his client "breached his fiduciary duty by placing his personal interests above the interests of his client" when he decided not to seek reimbursement from his client's former husband of her legal fees due to fear of personal embarrassment).

Having alleged facts sufficient to support the existence and breach of a fiduciary duty in the formation of the Operating Agreement, Aguirre's counterclaim states a viable claim for a declaratory judgment that the Operating Agreement is void and for damages.  "Where … , as here, a fiduciary relationship exists and where the dominant party benefits from execution of the document by the subservient party, a presumption of invalidity arises."  *Prueter v. Bork*, 435 N.E.2d 109, 112-13 (Ill. App. 1981).  And a plaintiff may recover damages for a breach of fiduciary duty where she "establish[es] the existence of a fiduciary duty, a breach of that duty, and damages proximately caused by the breach."  *Alonso v. Weiss*, 932 F.3d 995, 1001 (7th Cir. 2019).  As discussed, Aguirre sufficiently alleges the first two elements, and neither NPF nor

Schieneman contest the adequacy of her allegation that "Schieneman's breach of his fiduciary duties proximately caused damage to [her] in an amount in excess of $250,000." Doc. 147 at ¶ 104.

## II. IWPCA Claim

The IWPCA requires an employer "at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period," 820 ILCS 115/3, with the term "wages" defined as "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation," 820 ILCS 115/2. As the statutory text demands, "to state a claim under the IWPCA, [employees] are required to demonstrate that they are owed compensation from defendants pursuant to an employment agreement." *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016). That said, "[a]n employment agreement need not be a formally negotiated contract," and "a worker seeking to recover under it does not need to plead all contract elements if she can plead facts showing mutual assent to terms that support the recovery." *Landers-Scelfo v. Corp. Office Sys., Inc.*, 827 N.E.2d 1051, 1067-68 (Ill. App. 2005). "An employee can bring a private cause of action to recover the wages owed to [her], and can hold corporate officers and agents personally liable by proving that they knowingly permitted the corporation to violate the Wage Act." *Stafford v. Puro*, 63 F.3d 1436, 1440 (7th Cir. 1995) (citation omitted); *see* 820 ILCS 115/13 ("In addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act, any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation.").

Aguirre alleges that she and Schieneman agreed that NPF would pay her $800 per week to work eight hours per day and that she in fact worked for NPF at least eight hours per day.

Doc. 147 at ¶¶ 47, 110-111. She further alleges that NPF, at Schieneman's direction, declined to pay her as agreed. *Id*. at ¶¶ 47, 111, 113. That is sufficient to state an IWPCA claim. *See Sheaffer v. Glendale Nissan, Inc.*, 2020 WL 70939, at *3 (N.D. Ill. Jan. 6, 2020) ("Sheaffer alleges that he and Glendale Nissan came to an agreement as to how much Glendale Nissan would pay him during the hiring process. He also alleges that Glendale Nissan paid him less than the agreed-upon amount and therefore Glendale Nissan owes him wages. Sheaffer has therefore sufficiently stated a claim under the IWPCA.") (citations omitted); *Ziccarelli v. Phillips*, 2013 WL 5387864, at *12 (N.D. Ill. Sept. 25, 2013) (holding that the plaintiff's allegation that his immediate supervisor lacked the authority to take the challenged salary-related actions without the company president's "approval" and "advice or consent" was sufficient to state an IWPCA claim against the president).

Attempting to avoid this result, Schieneman argues that Aguirre insufficiently alleges that he possessed the knowledge necessary to be personally liable under the IWPCA. Doc. 183 at 10-12. But Aguirre alleges that "Schieneman -- as NPF's sole manager -- knowingly permitted NPF to violate the Wage Payment Act as set forth herein," Doc. 147 at ¶ 113, and Rule 9(b) provides that "knowledge … may be pleaded generally (which is to say, in a conclusory fashion)" and that "lack of detail does not permit dismissal." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009).

Schieneman next argues, as does NPF, that Aguirre's allegations that they failed to pay her the agreed-upon wage are "contradictory and implausible," Doc. 183 at 11, because she also alleges that she was NPF's CEO—and therefore in control of payroll—and that she agreed to provide sweat equity rather than receive a wage. Doc. 151 at 7-10; Doc. 183 at 11-13. But is plausible that Aguirre, as she has alleged, served as NPF's CEO but that Schieneman nonetheless exercised control over NPF's affairs and money and prevented her from receiving her agreed-

upon salary. Doc. 147 at ¶¶ 46-47, 113. Likewise, even if Aguirre initially agreed to work for sweat equity, it is plausible that she and Schieneman later agreed that she would be paid a wage. *Id*. at ¶¶ 47, 110. At the pleading stage, that is all Aguirre needs to go forward.

NPF also contends that, as an Indiana company, it is not governed by the IWPCA. Doc. 151 at 9-10. That contention fails, as "a corporation with no headquarters or physical presence in Illinois can still qualify as '[an Illinois] employer' under the Wage Act, where the plaintiffs make allegations of sufficient contacts with the state." *Watts v. ADDO Mgmt., L.L.C.*, 97 N.E.3d 75, 83 (Ill. App. 2018) (alterations in original) (internal quotation marks omitted). NPF's complaint alleges that El Palomino Ranch—where Aguirre worked—is located in Illinois. Doc. 170 at ¶ 3. Accordingly, the work relevant to Aguirre's IWPCA claim, taking the alleged facts in the light most favorable to her, occurred in Illinois, allowing her to invoke the IWPCA. *See Watts*, 97 N.E.3d at 84 (refusing to dismiss IWPCA claims where the "plaintiffs were Illinois residents and … the work they performed originated and ended in Illinois," and distinguishing cases where a "non-Illinois resident … performed all of his work outside of Illinois" and where "a New York resident … travelled to Illinois only a few days out of the year for training").

Finally, NPF argues that Aguirre's claim is defeated by the IWPCA's exception for independent contractors, 820 ILCS 115/2. Doc. 151 at 9-10. A worker is an independent contractor, and thus not covered by the IWPCA, if the employer (1) "did not exert control and direction over the performance of [her] work, (2) [she] performed [her] work outside all of [her] employer's] places of business" or outside the usual course of business, "and (3) [she] was in an independently established trade, occupation, profession or business." *Marcus & Millichap Inv. Servs. of Chi., Inc. v. Sekulovski*, 639 F.3d 301, 310 (7th Cir. 2011). "These requirements are to be read in the conjunctive." *Ibid*. (internal quotation marks omitted).

In seeking to satisfy the second requirement, NPF argues that because Aguirre's work took place at El Palomino Ranch and NPF never took possession of the ranch, she performed her work outside NPF's places of business.  Doc. 151 at 9-10.  But Aguirre also alleges that, until Summer 2018, Aguirre and NPF "ran the Ranch pursuant to an informal agreement with the owner of the land … and the owner of the business/equipment."  Doc. 147 at ¶ 56.  And no party suggests that NPF ceased conducting business at the ranch after the Asset Purchase Agreement and "Phony Lease" were executed in Summer 2018.  Because an employer need not own a facility for the facility to constitute its place of business, *see Novakovic v. Samutin*, 820 N.E.2d 967, 975 (Ill. App. 2004) ("An employer's place of business is not limited only to its own home offices, but can extend to any location where workers regularly represent an employer's interest."), Aguirre adequately alleges that she conducted her work at NPF's place of business and in the usual course of its business.  At least on the pleadings, the IWPCA's independent contractor exception does not bar Aguirre's claim.

## III.     Defamation Claim

To state a defamation claim under Illinois law, a plaintiff must allege "facts showing that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages."  *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009); *see also Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 726 (7th Cir. 2004).  Illinois recognizes two types of defamation: per quod and per se.  *See Tuite v. Corbitt*, 866 N.E.2d 114, 121 (Ill. 2006).  In a per quod action, the plaintiff must plead actual damages.  *See ibid*.; *Republic Tobacco*, 381 F.3d at 726.  In a per se action, the statement's defamatory character is considered so "obvious and apparent on its face" that "injury to the plaintiff's reputation may be presumed."  *Tuite*, 866 N.E.2d at 121; *see also Republic Tobacco*, 381 F.3d at 726.  Illinois recognizes five categories of defamation per se, two of which

are relevant here: "statements imputing an inability to perform or want of integrity in the discharge of duties of office or employment[,] and statements that prejudice a party, or impute lack of ability, in his or her trade." *Bd. of Forensic Document Exam'rs, Inc. v. ABA*, 922 F.3d 827, 832 (7th Cir. 2019) (internal quotation marks omitted).

To survive dismissal, a defamation claim must "identify the defendant's false statements and allege their communication to a third party." *Johnson v. Schnuck Mkts., Inc.*, 495 F. App'x 733, 736 (7th Cir. 2012). "[T]he Seventh Circuit has not spoken as to the exact pleading standard for claims of defamation." *Gardner v. Kappa Alpha Psi Fraternity*, 2013 WL 3724865, at *2 (N.D. Ill. July 12, 2013). Although some level of specificity is required, "Rule 8 does not require that the [counterclaim] recite verbatim the allegedly defamatory statement." *Rivera v. Allstate Ins. Co.*, 140 F. Supp. 3d 722, 728 (N.D. Ill. 2015) (collecting cases); *see also Smith v. Evans*, 2019 WL 6327423, at *4 (N.D. Ill. Nov. 25, 2019) (same); *United Labs., Inc. v. Savaiano*, 2007 WL 4557095, at *11 (N.D. Ill. Dec. 21, 2007) ("[A]lthough plaintiffs are required to set forth the defamatory language with sufficient detail so as to allow the defendant to formulate an appropriate response, plaintiffs need not allege the defamatory language verbatim.") (internal quotation marks omitted).

As noted, Aguirre identifies six allegedly defamatory statements that were published on NPF's website. Doc. 147 at ¶ 90. NPF and Schieneman may be correct that certain of those statements do no more than refer generally to Aguirre as a "liar" or as having "lied," and thus cannot ground a defamation claim. *See Piersall v. SportsVision of Chi.*, 595 N.E.2d 103, 107 (Ill. App. 1992) ("[T]he general statement that someone is a liar, not being put in context of specific facts, is merely opinion."). But at the very least, Schieneman and NPF's statements that Aguirre told specific lies about the ownership of certain horses and whether she raced horses not

belonging to her, Doc. 147 at ¶ 90, are sufficiently definite and factual to form the basis of a defamation claim. *See Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E. 2d 825, 840 (Ill. 2006) (holding that, while "an expression of opinion" is entitled to "constitutional protection, … [t]he test is restrictive: a defamatory statement is constitutionally protected only if it cannot be reasonably interpreted as stating actual fact. … If a statement is factual, and it is false, it is actionable"); *Life After Hate, Inc. v. Free Radicals Project, Inc.*, 2019 WL 2644237, at *10 (N.D. Ill. June 27, 2019) (holding that a defendant's statements that the plaintiff was a liar and that his memoir was a lie were, taken in context, "verifiable and had factual content" and could therefore form a basis for a defamation claim).

Pressing the contrary result, NPF and Schieneman contend that certain of Aguirre's filings in this case admit that she lied about the ownership of horses and that she raced horses not belonging to her—and therefore that the alleged defamatory statements are true. Doc. 151 at 12-13; Doc. 183 at 14-15. This contention overreads the cited filings, which do not establish (at least at the pleading stage, where all reasonable inferences are drawn in her favor) that Aguirre admitted to lying about the ownership of horses or to racing horses she did not own. Doc. 146 at ¶ 127 (in response to the operative complaint, admitting that, "on or around October 17, 2018, Aguirre denied that So Tempted had been contributed to NPF Racing"); *id*. at ¶¶ 173-175 (in response to the operative complaint, admitting that Aguirre raced So Tempted on September 29, 2018, raced Joey Mercury on October 6, 2018, and transported Joey Mercury to a race on November 4, 2018); Doc. 47 at ¶ 93 (in response to the amended complaint, admitting that "[p]ublic records show that on September 23, 2017, Defendant Aguirre purchased three horses," and that two of them, including So Tempted, "were later named as contributions to NPF Racing"), Doc. 115-2 at ¶ 34 (averring that the spreadsheet attached to her declaration "reflects

the status of all of the horses identified" therein "based upon on [sic] my personal knowledge, best recollection and review of documents -- including title documents -- that have been maintained as business records at the Ranch"); Doc. 115-17 at 4 (the aforementioned spreadsheet, which reflects that as of April 29, 2019, Aguirre was So Tempted's "registered owner" and NPF was its "actual owner," and that, "[p]rior to NPF," the horse had been "[g]iven to Yesenia Aguirre by Luis Davila when he could no longer care for the horse"); Doc. 27 at ¶ 35 (in response to the original complaint, admitting that a horse named Joey Mercury was donated to Aguirre at an unspecified time, and that Joey Mercury now belongs to NPF).  These statements say nothing directly about whether Aguirre lied about the ownership of horses.  And because the statements indicate only that So Tempted and Joey Mercury once belonged to Aguirre and now belong to NPF—and do not speak to the date on which ownership changed— they do not establish at the pleading stage that the horses were not owned by Aguirre when she raced them.

Relatedly, NPF maintains that Aguirre "has not consistently represented her horse ownership" in filings to the court.  Doc. 167 at 9.  But NPF does not identify those filings, and even if it were correct, that would not establish at the pleading stage that Aguirre has admitted the truth of the allegedly defamatory statements.  Indeed, a central issue in this case is the ownership of various horses, as well as the representations parties made and actions they took with respect to such horses.  *Cf*. 2019 WL 2327647, at *4 (N.D. Ill. May 31, 2019) (the court's preliminary injunction opinion detailing the parties' disagreements as to the ownership or existence of various horses as of that point in time); *ibid*. ("The parties agree that NPF's likelihood of success on the merits turns on the likelihood that it owns the horses.").

Accordingly, the truth or falsity of the allegedly defamatory statements is a disputed factual matter ill-suited for resolution at this stage.

NPF also maintains that because Aguirre alleges that she possessed "fame in the [horse-show] industry," Doc. 147 at ¶ 23, she must allege that any defamatory statements were made with actual malice. Doc. 151 at 11. "Demonstrating actual malice is a requirement for a public figure … to recover damages for defamation … ." *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 612 (7th Cir. 2013) "Actual malice" means that a statement was made "with knowledge that it was false or with reckless disregard for the truth." *Novoselsky v. Brown*, 822 F.3d 342, 352 (7th Cir. 2016) (internal quotation marks omitted).

Aguirre does not argue that she is not a public figure. She instead contends, Doc. 162 at 12-13, that she has pleaded actual malice by alleging that Schieneman "embarked on a campaign to ruin Aguirre and the Ranch's business by covertly and publicly contacting Aguirre's associates, family, colleagues and customers, as well as members of the Mexican-American community to interfere with her business, the operations of the Ranch, and, more specifically to defame Aguirre, call the Ranch's legitimacy and future in question and cast her and her business in disrepute." Doc. 147 at ¶ 89. Aguirre's allegation that NPF and Schieneman published defamatory statements "knowing they were false and/or with reckless disregard for whether they were true or false," *id*. at ¶ 118, together with her allegation that Schieneman deliberately sought to defame her, are enough to allege actual malice. *See Intercon Sols., Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1057 (N.D. Ill. 2013) (holding that the actual malice requirement was satisfied where the complaint alleged that the defendant conducted an "illicit investigation" that resulted in the allegedly defamatory statements, that the defendant should have known its investigation was flawed and that its accusations were false, and that the defendant's actions

were motivated by self-interest); *Pippen v. NBC Universal Media, LLC*, 2012 WL 12903167, at *2 (N.D. Ill. Aug. 2, 2012) ("Although Rule 9(b) of the Federal Rules of Civil Procedure allows malice to be alleged 'generally,' the bare conclusory claim of malice, unaccompanied by allegations from which the required subjective element of malice might be inferred, is insufficient to survive a motion to dismiss."), *aff'd sub nom. Pippen*, 734 F.3d at 614 ("States of mind may be pleaded generally, but a plaintiff still must point to details sufficient to render a claim plausible."); *Osundairo v. Geragos*, 2020 WL 1275001, at *9 (N.D. Ill. Mar. 17, 2020) (same).

## Conclusion

NPF's and Schieneman's motions to dismiss are denied. NPF and Schieneman shall answer the counterclaims and third-party claims, respectively, by April 24, 2020.

March 20, 2020

_____
United States District Judge