UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NPF RACING STABLES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 6216 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| YESENIA G. AGUIRRE, individually and d/b/a Cuadra El Fenix, EL FENIX INC., RANCHO EL FENIX INC., BENJAMIN HERNANDEZ, HECTOR RODRIGUEZ, individually and d/b/a Cuadra La Araña, CARLA LLERENAS, JOSE LUIS DAVILA CAMPOS, JOSE JESUS VALENZUELA, CESAR CANO, and DAVID ARQUIMIDEZ HUICOCHEA-SILVA, d/b/a Adelante Design & Print, | ) | |
| Defendants. | ) | |
| and | ) | |
| YESENIA G. AGUIRRE, | ) | |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | ) | |
| vs. | ) | |
| NPF RACING STABLES, LLC, | ) | |
| Counter-Defendant | ) | |
| and | ) | |
| KARL SCHIENEMAN, | ) | |
| Third-Party Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

NPF Racing Stables, LLC, a horse racing company, brought this diversity suit against

Yesenia Aguirre, El Fenix Inc., Rancho el Fenix Inc., Benjamin Hernandez, Hector Rodriguez,

Carla Llerenas, Jose Luis Davila Campos, Jose Jesus Valenzuela, Cesar Cano, and David

1

Arquimidez Huicochea-Silva. Doc. 170. NPF alleges that Aguirre defrauded, embezzled from, and breached her fiduciary duties to NPF while she was its CEO, and that after NPF manager Karl Schieneman terminated her as CEO and notified her that NPF had bought out her membership in the LLC, she and her co-defendants took possession of, and have continued to use and profit from, NPF's horses and equipment.

Earlier in the litigation, the court granted NPF's writ of replevin as to two of the horses, a starting gate, a Chevy truck, and a Ford tractor, Docs. 80-81, and that property was replevied in April 2019, Doc. 104. The following month, the court granted in part NPF's motion for a preliminary injunction as to five horses and certain equipment, prohibiting Defendants from selling, leasing, or encumbering that property or physically removing it from El Palomino Ranch, the venue where NPF conducts its events. Docs. 131-133 (reported at 2019 WL 2327647 (N.D. Ill. May 31, 2019)). The court thereafter denied NPF's and Schieneman's motions to dismiss Aguirre's counterclaims and third-party claims. Docs. 249-250 (reported at 2020 WL 1322847 (N.D. Ill. Mar. 20, 2020)). NPF now moves for summary judgment on certain of its claims, seeking possession and ownership of the business operating at El Palomino Ranch, various items of personal property, and several horses, as well as a declaration that Rancho El Fenix Inc.'s deed to Beecher Ranch is void. Doc. 287. NPF alternatively moves for the appointment of a receiver to administer the disputed assets. Doc. 291. The motion for partial summary judgment is granted in part and denied in part, and the motion to appoint a receiver is denied in part and denied as moot in part.

## Background

### A. Defendants' Noncompliance with Local Rule 56.1(b)(3)

Consistent with Local Rule 56.1, NPF filed and served a Local Rule 56.1(a)(3) statement of undisputed facts and a Local Rule 56.2 Notice along with its summary judgment motion.

Docs. 287-1, 287-14. The factual assertions in the Local Rule 56.1(a)(3) statement cite evidentiary material in the record and are supported by the cited material. *See* N.D. Ill. L.R. 56.1(a) ("The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph.").

If Defendants wished to oppose summary judgment, Local Rule 56.1 required them to file:

> (1) any opposing affidavits and other materials referred to in Fed. R. Civ. P. 56(e); (2) a supporting memorandum of law; and (3) a concise response to the movant's [Local Rule 56.1(a)(3)] statement that shall contain: (A) numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed, and (B) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and (C) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

N.D. Ill. L.R. 56.1(b). While Aguirre filed a tardy response to NPF's motion for appointment of a receiver, Doc. 330, neither she nor her co-defendants filed a Local Rule 56.1(b)(3)(B) response or anything else in opposition to NPF's summary judgment motion.

Defendants' *pro se* status does not excuse them from their failure to comply with Local Rule 56.1. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Zoretic v. Darge*, 832 F.3d 639, 641 (7th Cir. 2016) ("While we liberally construe the pleadings of individuals who proceed pro se, neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes.") (internal quotation marks omitted); *Brown v. Wyndemere LLC*, 608 F. App'x 424, 425 (7th Cir. 2015) ("[A] district court is entitled to enforce its local rules, even against *pro*

3

*se* litigants."). The court therefore deems admitted all material facts set forth in NPF's Local Rule 56.1(a)(3) statement and supported by the cited evidentiary materials. *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the [Local Rule 56.1(a)(3)] statement … will be deemed to be admitted unless controverted by the [Local Rule 56.1(b)(3)] statement of the opposing party."); *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 411 (7th Cir. 2019) ("According to well-established Seventh Circuit law, [the nonmovant's] noncompliance [with Local Rule 56.1(b)] meant that the district court could exercise its discretion to accept [the movant's] statements of fact as undisputed."); *Olivet Baptist Church v. Church Mut. Ins. Co.*, 672 F. App'x 607, 607 (7th Cir. 2017) ("The district court treated most of the [movant's] factual submissions as unopposed, because the [nonmovant] failed to contest them in the form required by Local Rule 56.1(b). We have held that the district court is entitled to enforce that rule in precisely the way it enforced the rule in this litigation.") (collecting cases); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by [Local Rule 56.1(b)(3)(B)], those facts are deemed admitted for purposes of the motion.") (internal quotation marks omitted); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("Because of the important function that local rules like [Local] Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules. … [Local] Rule [56.1(b)(3)(B)] required [the non-movant] to admit or deny each factual statement proffered by [the movant].") (internal quotation marks omitted).

That said, the court is mindful that "a nonmovant's failure to respond to a summary judgment motion, or failure to comply with Local Rule 56.1, does not … automatically result in

judgment for the movant. [The movant] must still demonstrate that it is entitled to judgment as a matter of law." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (internal quotation marks omitted). The court therefore will recite the material facts as favorably to Defendants as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. v. Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

### A. Material Facts

The background to this suit is set forth in the court's prior opinions, familiarity with which is assumed. The facts pertinent at the present juncture are as follows.

Aguirre and Schieneman formed NPF in August 2017 to acquire, train, breed, and race quarter horses. Doc. 287-1 at ¶¶ 1, 3; Doc. 287-3 at p. 3, ¶ 4. NPF is a manager-managed Indiana LLC. Doc. 287-1 at ¶ 1. Schieneman has served as a member of NPF and its manager since its formation. *Ibid*. Initially, Aguirre was NPF's only other member, and was appointed its CEO in October 2017. *Id*. at ¶¶ 1, 3. The pair's relationship later soured owing to personal and business disagreements. *Id.* at ¶¶ 25-27. On August 15, 2018, Schieneman terminated Aguirre from her CEO position, and, about a month later, NPF purchased her membership interest in the LLC. *Id*. at ¶¶ 3, 26, 35. According to NPF, despite the termination of her relationship with NPF, Aguirre and her co-defendants continue to wrongfully possess or retain ownership over NPF property.

#### 1. El Palomino Ranch

NPF claims that it is entitled to ownership and possession of the business located at El Palomino Ranch and certain of the business's assets. Doc. 170 at ¶¶ 210-218, 251-257; Doc. 290 at 21-27; Doc. 304 at 2-7.

5

El Palomino Ranch is an equine boarding, training, and event business in Grant Park, Illinois. Doc. 287-1 at ¶ 13. In 2018, Sacramento Chavez owned and operated El Palomino Ranch under an oral lease with Theodora Kamaratos, the landlord. *Ibid.*; Doc. 287-13 at p. 42, ¶ 9. Chavez's leasehold gave him the exclusive right to use the property. Doc. 287-1 at ¶ 13. While he owned El Palomino Ranch, Chavez constructed a horse racing track and parking lot, among other amenities, and he purchased equipment such as a tractor and a starting gate for the business's operations. *Id*. at ¶ 14.

In Spring 2018, Aguirre—in her capacity as NPF's CEO—approached Chavez about purchasing the El Palomino Ranch business. *Id*. at ¶ 15. Aguirre arranged for Chavez to meet Schieneman to discuss a potential sale. *Ibid.* While negotiating with Chavez, Aguirre and Schieneman spoke to Kamaratos about buying the real estate on which El Palomino Ranch was located. *Id*. at ¶ 17. Kamaratos told Aguirre and Schieneman that the deed would convey only the real property, and that they would also need to acquire the leasehold and business owned by Chavez in order to operate El Palomino Ranch. *Ibid.*

Aguirre and Schieneman's discussions with Chavez culminated in a letter of intent, signed on June 19, 2018, with Chavez signing for the "Sellers" and Aguirre and Schieneman for the "Buyers." *Id*. at ¶ 16 (citing Doc. 287-13 at 26-27). The letter of intent spelled out three planned events: (1) the purchase of the real estate from Kamaratos; (2) the purchase of the El Palomino Ranch business and assets from Chavez; and (3) payment to Ricardo Martinez for his interest in holding horse racing events at El Palomino Ranch. *Ibid.* After those events occurred, "NPF Racing Stables [would have] the exclusive right to hold horse race events and sell food and liquor" at El Palomino Ranch. *Ibid.* (quoting Doc. 287-13 at 26). Pursuant to the letter of intent, NPF was permitted to begin hosting events at the ranch and making improvements as of June 23,

6

2018. *Ibid*. That summer, NPF began hosting events, performed maintenance on the horse track, and constructed a VIP viewing tower. *Id*. at ¶ 18. The tower was commissioned by Aguirre, who signed NPF's check to pay for it. *Ibid*.

On July 31, 2018, El Fenix Inc.—a company owned by Aguirre—purchased El Palomino Ranch's real estate from Kamaratos by warranty deed. *Id*. at ¶ 19. Schieneman made a mortgage loan of $642,000 to El Fenix and Aguirre, which enabled El Fenix to make the purchase. *Ibid*.

Three days later, on August 3, Aguirre and Schieneman entered into an Asset Purchase Agreement ("APA") with Chavez. *Id*. at ¶ 20 (citing Doc. 287-13 at 8-24). The APA laid out the steps taken since the letter of intent was signed—namely, El Fenix's purchase of the real estate on which El Palomino Ranch was located, as well as NPF's interim payments to Martinez for his right to hold horse races there. *Id*. at ¶ 21. Under the APA's terms, Chavez sold to NPF (the "Buyer") "all assets required for the continued conduct of the [horse racing] Business" at El Palomino Ranch. *Id*. at ¶¶ 20, 22 (quoting Doc. 287-13 at 11). Those assets included Chavez's rights in "leases" and other agreements, his leasehold improvements (*e.g.*, the horse track and parking lot), and various equipment (*e.g.*, a Ford tractor and a starting gate). *Id*. at ¶ 23 (citing Doc. 287-13 at 17-18, 20) (listing the assets). Chavez conveyed the assets to NPF in his capacity as the "Seller" and "exclusive operator" of El Palomino Ranch. *Id*. at ¶¶ 20, 27 (citing Doc. 287-13 at 8, 19). Aguirre signed the APA on behalf of NPF in her capacity as its CEO and partner in NPF's intended subsidiary, El Palomino LLC, and as owner of El Fenix, the "Landlord." *Id*. at ¶¶ 20-21 (citing Doc. 287-13 at 8, 17, 19). Schieneman signed the APA as manager of NPF and El Palomino LLC. *Id*. at ¶ 20 (citing Doc. 287-13 at 19).

7

NPF successfully operated El Palomino Ranch for a few weeks in August, hosting several events. *Id*. at ¶ 24. During that time, NPF built a second viewing tower, a cabana, and fencing, installed a commercial ice maker and a large screen television, and made various cosmetic improvements. *Ibid*. As NPF's CEO, Aguirre signed the check for the second viewing tower on August 2, 2018, a few days after she accepted the real estate deed on behalf of El Fenix. *Ibid*.

Tensions soon arose between Aguirre and Schieneman. *Id*. at ¶ 25. On August 15, Aguirre told Schieneman that El Fenix—not NPF—held the exclusive right to host events at El Palomino Ranch. *Id*. at ¶ 26. Schieneman responded that day by firing Aguirre as NPF's CEO. *Ibid*. Aguirre later elaborated on El Fenix's position in writing, stating: "El Fenix inc. [sic] currently has the mortgage of the property and is entitled to rent and operate the property how ever [sic] it wishes. NPF does not hold the exclusive rights to host events as it does not mention the word 'exclusive' in the [APA]. Sacramento Chavez never owned the business … ." *Id*. at ¶ 27 (quoting Doc. 287-5 at 48-49).

In response to Aguirre's submission, Schieneman asked Chavez and Kamaratos to confirm in writing their understanding regarding the lease of the property. *Id*. at ¶ 28. They did so on July 31, 2018, asserting that the lease between Chavez and Kamaratos gave Chavez "the exclusive right [to] use the Property" as "[t]enant," with Kamaratos retaining the right as "[l]andlord" "to sell the Property" subject to "buyout [of the tenant's] lease rights." Doc. 287-13 at 144. In their understanding, "El Fenix, Inc. now has the rights of the [l]andlord and [NPF] has the rights of the [t]enant" as a result of El Fenix's purchase of the real estate and NPF's buyout of Chavez's leasehold. *Ibid*.

Aguirre remained unconvinced. Continuing to believe that El Fenix had the right to operate El Palomino Ranch, she made plans to host an event on August 25. Doc. 287-1 at ¶ 29.

8

To smooth over tensions, she offered to split the profits 50-50 with NPF. *Ibid*. Schieneman rejected the offer, citing the event's "unprecedented scale" and Aguirre's failure to obtain the requisite permits. *Ibid*. Aguirre nonetheless pressed on, prompting NPF to file suit against El Fenix in state court to stop the event from happening. *Id*. at ¶¶ 30-31. On August 24, the day before the event was to occur, the parties negotiated an agreement permitting El Fenix to hold the event in exchange for $6,500 in "rent" paid to NPF. *Id*. at ¶¶ 31-32. El Fenix hosted the event as planned, and the state court suit was dismissed. *Id*. at ¶ 31. El Fenix later agreed to pay "rent" to NPF a second time to host an event the following weekend, on September 1. *Id*. at ¶ 33. After the second event, El Fenix kept possession of El Palomino Ranch and refused to pay further rent. *Id*. at ¶¶ 34, 36. By letter dated September 7, NPF notified Aguirre that it was repurchasing her membership in the LLC "for cause." *Id*. at ¶ 35.

### 2. Chevy Truck and Trailers

NPF claims that it is the rightful owner of a Chevy Silverado truck, a horse trailer, and a jockey trailer. Doc. 170 at ¶¶ 191-195; Doc. 290 at 33-34; Doc. 304 at 9.

Schieneman paid Aguirre $45,000 for the Chevy truck on September 1, 2017. Doc. 287-1 at ¶ 54. The transaction's terms were spelled out in an asset purchase agreement that NPF calls the "Truck APA." *Ibid*. Under the Truck APA's terms, the vehicle was "to be contributed to a soon to be formed entity NPF," thereby "be[coming] the property of the Company." *Ibid*. (quoting Doc. 287-8 at 18). Before Aguirre signed the Truck APA, she told Schieneman that she had bought the Chevy from Campos using borrowed funds. *Ibid*. In fact, Aguirre had purchased the truck from someone else several months earlier, titled it in her name, and financed it with a loan from Capital One for $43,000. *Ibid*. Aguirre never paid off the Capital One loan with the

$45,000 she received from Schieneman, and the truck remains titled in her name. *Ibid*. NPF replevied the truck on April 10, 2019. Doc. 104.

Once NPF was formed, Schieneman and Aguirre purchased two trailers—a horse trailer and a jockey trailer—using NPF funds. Doc. 287-1 at ¶¶ 55-56. Schieneman signed a $15,000 check for the horse trailer (the "Sooner Horse Trailer") on November 19, 2017, and the funds were drawn from NPF's bank account. *Id*. at ¶ 55. Aguirre registered the Sooner Horse Trailer in her own name using company funds, and now refuses to return it to NPF. *Ibid*. In early February 2018, Aguirre bought the Jockey Trailer for $10,500, funding the purchase with $8,500 from NPF and $2,000 of her own money. *Id*. at ¶ 56 & n.14. Aguirre has claimed that Campos owns the Jockey Trailer and that its whereabouts are unknown. *Ibid*. (citing Doc. 287-12 at p. 6, ¶ 9). For his part, Campos has stated that he owns "a small mobile home," not the Jockey Trailer. *Ibid*. (citing Doc. 227 at ¶ 48).

### 3. Horses

NPF seeks a declaration that it is the owner of 32 horses and an order directing Defendants to turn over 27 of those horses. Doc. 170 at ¶¶ 166-172; Doc. 304 at 11 (listing the horses). Of those horses, three have died and two have been replevied. Doc. 287-1 at ¶¶ 39, 41 (listing the replevied horses); Doc. 290 at 17 (listing the dead horses). The horses in dispute fall into two categories: (1) those allegedly purchased or acquired by NPF, some of which had foals; and (2) others allegedly contributed to NPF at its formation.

*Purchased or Acquired Horses*. Horses (1) through (4) were purchased by Aguirre using NPF funds at a time when she was its CEO. Doc. 287-1 at ¶¶ 39-40. NPF replevied Horse (1), Bruce Allmty, on April 10, 2019. Doc. 104; *see* Doc. 47 at ¶ 58 (admitting that NPF purchased Bruce Allmty). Horse (2), Bourbon Street Girl, has two foals. Doc. 287-1 at ¶ 40; Doc. 304 at

11 (listing the foals as horses (5) and (6)). Earlier in the litigation, Aguirre averred that Schieneman gave those horses to her as gifts. Doc. 287-1 at ¶¶ 39-40.

Aguirre purchased horses (27), (28), (29), and (32) using NPF funds. *Id*. at ¶¶ 43, 45, 53. Horse (29), BR Sweet Sensation, has two foals. *Id*. at ¶ 43; Doc. 304 at 11 (listing the foals as horses (30) and (31)). In prior filings and discovery responses, Defendants asserted that Llerenas bought horses (27), (28), and (29) from Aguirre, and that Llerenas owns BR Sweet Sensation's foals. Doc. 287-1 at ¶¶ 43, 45. Moreover, Aguirre previously asserted that horse (32), Leaps of Faith, belongs to "Sergio Cortez," but she has not produced any records to substantiate that assertion. *Id*. at ¶ 53.

*Contributed Horses*. Schieneman paid for horses (7) and (8)—Switch to a Corona and Skye Fire—and contributed them to NPF around the time of its formation. *Id*. at ¶ 42. Both horses are subject to the preliminary injunction order. 2019 WL 2327647, at *4-5; *see* Doc. 118-16 at 4 (admitting that NPF owns Switch to a Corona and Skye Fire).

Aguirre contributed horses (9) through (23) to NPF. Doc. 287-1 at ¶¶ 41, 44, 46-52. NPF replevied Horse (9), Captain BD, on April 10, 2019. Doc. 104; *see* Doc. 47 at ¶ 61 (admitting that Aguirre contributed Captain BD to NPF "to the extent of her 50% ownership"); Doc. 287-3 at p. 31, ¶ 66 (stating that NPF bought the other 50% interest in Captain BD). Horse 18 (Junos Blue Boy) and Horse 22 (So Tempted) are subject to the preliminary injunction order. 2019 WL 2327647, at *5; *see* Doc. 118-16 at 3-4 (admitting that NPF owns those two horses).

### 4. Beecher Ranch

NPF seeks a declaration that the deed held by Rancho El Fenix Inc.—another company owned by Aguirre—to Beecher Ranch, a five-acre property in Beecher, Illinois, is void. Doc. 170 at ¶¶ 154-157; Doc. 290 at 35; Doc. 304 at 9-10.

11

During Aguirre's tenure as CEO, NPF stabled some horses at Beecher Ranch. Doc. 287-1 at ¶ 57. Based on what Aguirre told him about the arrangement, Schieneman understood that NPF was renting Beecher Ranch, and NPF accordingly made various improvements to the ranch and restored its electrical service after a storm in February 2018. *Ibid*. On June 12, 2018, Aguirre used NPF funds to pay for the recording of a deed conveying Beecher Ranch to Rancho El Fenix Inc. *Id*. at ¶ 58. NPF did not authorize the transaction or ratify it after the fact. *Ibid*. Aguirre admits that she "never disclosed to NPF Racing's Manager the opportunity to purchase the property, or the purchase itself." *Ibid*. (quoting Doc. 176 at p. 22, ¶ 52). Aguirre and Rancho El Fenix Inc. have conceded that the deed to Beecher Ranch is "void," having been obtained at no cost. *Ibid*. (citing Doc. 27 at ¶ 36; Doc. 47 at ¶ 44).

## Discussion

NPF seeks summary judgment on its trespass and declaratory judgment counts for the return of El Palomino Ranch (Counts XVI and XXV), Doc. 170 at ¶¶ 210-213, 251-257, and on its detinue counts for the return of the horses, the Sooner Horse Trailer, the Jockey Trailer, and other personal property (Counts IX, XII, and XVII), *id*. at ¶¶ 166-172, 191-195, 214-218. Doc. 290 at 7. NPF also seeks summary judgment on its count for a declaratory judgment that Rancho El Fenix Inc.'s deed to Beecher Ranch is void (Count VI), Doc. 170 at ¶¶ 154-157. Doc. 290 at 8.

### I. El Palomino Ranch

NPF seeks an order of possession of El Palomino Ranch, asserting that it purchased Chavez's right as "tenant" to own and operate the ranch. Doc. 170 at ¶¶ 210-213, 251-257; Doc. 290 at 21-26; Doc. 304 at 3-6. Under Illinois law, if a deed-holding landlord conveys property subject to a tenant's lease, the lease runs with the land and the new landlord steps into the old landlord's shoes. *See 1002 E. 87th St. LLC v. Midway Broad. Corp.*, 107 N.E.3d 868, 872 (Ill.

12

App. 2018) ("If a landlord conveys property by warranty deed without reserving any rights, he or she also conveys the leases for the property, as well as the right to receive unaccrued rent."). Citing this principle, NPF submits that El Fenix purchased El Palomino Ranch's real estate subject to Chavez's—and later NPF's—tenancy, and that because Chavez's tenancy gave him "the exclusive right [to] use the Property," Doc. 287-13 at 144, NPF is entitled to the same.

NPF's understanding of its interest in El Palomino Ranch follows from the undisputed facts. In the leadup to El Fenix's purchase of the land on July 31, 2018, Kamaratos informed Aguirre and Schieneman that the warranty deed would convey only the real property, and that they would also need to acquire the leasehold and business that Chavez owned in order to operate El Palomino Ranch. Doc. 287-1 at ¶ 17. Consistent with what Kamaratos had told them, Aguirre and Schieneman worked with Chavez to acquire his interest in the ranch. Their discussions yielded a letter of intent—signed over a month before El Fenix bought the land—contemplating that NPF's purchase of Chavez's leasehold would give it "the exclusive right" to hold horse race events and run operations at El Palomino Ranch. Doc. 290 at 22 (quoting Doc. 287-13 at 26). NPF began operating the ranch shortly afterward. Doc. 287-1 at ¶ 24.

All this goes to show that El Fenix (through Aguirre) knew about the division between the real estate and leasehold interests prior to its purchase of the real estate. El Fenix's actions in the sale's aftermath confirm as much. Just three days after obtaining the land, El Fenix signed the APA between NPF and Chavez—*i.e.*, "the exclusive operator of El Palomino [R]anch"—as the "landlord." Doc. 287-13 at 8, 17, 19. And El Fenix later agreed twice to pay "rent" to NPF for the privilege of hosting events at El Palomino Ranch. Doc. 287-1 at ¶¶ 32-33.

13

To sum up: The documents and the parties' course of dealing demonstrate that NPF is the rightful owner and operator of the business and leasehold (but not the real estate) at El Palomino Ranch. The court thus declares that NPF is entitled to the exclusive possession of the ranch.

## II.     Personal Property

NPF alleges that Defendants remain in unlawful possession of its personal property, and it seeks the return of that property by way of "detinue." Doc. 170 at ¶¶ 191-195, 214-218; Doc. 290 at 26-27, 33-34; Doc. 304 at 6-7, 9. Under Indiana and Illinois law, detinue is a possessory action for the recovery of specific personal property and damages. *See Robinson v. Valladares*, 738 N.E.2d 278, 282 (Ind. App. 2000); *Relational Funding Corp. v. Siemens Info. & Commc'ns Networks, Inc.*, 2000 WL 1222126, at *2 (N.D. Ill. Aug. 23, 2000) (citing *Gary Acceptance Corp. v. Napilillo*, 230 N.E.2d 73, 76 (Ill. App. 1967)). NPF does not presently request damages, reserving that remedy for when it can ascertain the condition of the property not in its possession. Doc. 304 at 7.

### A.     Personal Property at El Palomino Ranch

NPF seeks an order declaring that it owns the assets it purchased from Chavez under the APA (listed at Doc. 287-4 at 48), as well as the commercial ice maker, large television, viewing towers, fencing, cabana, and other improvements to El Palomino Ranch. Doc. 170 at ¶¶ 214-218; Doc. 290 at 26-27; Doc. 304 at 6-7. Such relief is appropriate. Under the APA's terms, title to the first set of items—which include the tractor and starting gate subject to the court's replevin order—passed to NPF at the APA's closing. Doc. 287-4 at 45 ("Subject to the terms and conditions set forth in this Agreement, at the Closing Seller will sell, transfer, convey, assign and deliver to Buyer, and Buyer will purchase, acquire, and accept from Seller, free and clear of all Liens, all right, title and interest in and to the … Seller's Assets."); *id*. at 48 (identifying

14

"Seller's Assets"). As to the remaining items, NPF is their lawful owner because it purchased them with its own funds. Doc. 287-1 at ¶ 24.

### B. Chevy Truck and Trailers

NPF correctly submits that it owns the Chevy truck (which it has replevied), subject to any rights Capital One has in the vehicle. Doc. 170 at ¶ 192; Doc. 290 at 33; Doc. 304 at 9. Schieneman contributed the vehicle to NPF under the Truck APA, making NPF its lawful owner. Doc. 287-8 at 18 ("Karl Schieneman is purchasing a 2017 Chevrolet Silverado … to be contributed to a soon to be formed entity NPF Horse Racing Stables, LLC …"). In addition, NPF is the lawful owner of the Sooner Horse Trailer because it was purchased with NPF's funds. Doc. 170 at ¶ 192; Doc. 287-1 at ¶ 55.

At this juncture, NPF has failed to adduce sufficient evidence that it holds an undivided interest in the Jockey Trailer. Doc. 170 at ¶ 193. While admitting that Aguirre contributed $2,000 of her own money toward the Jockey Trailer's purchase, NPF alleges that it "more than funded that $2,000 through unaccounted-for cash withdrawals by Aguirre from NPF's PNC Bank account." Doc. 287-1 at ¶ 56 n.14. But the record does not indisputably connect the dots in that manner. Further complicating matters, Aguirre avers that Campos now owns the trailer, Doc. 287-12 at p. 6, ¶ 9, but Campos asserts that he owns a "small mobile home" distinct from the "mobile trailer" that the parties call the Jockey Trailer, Doc. 227 at ¶ 48 ("I think there is a confusion regarding the mobile trailer."). Because genuine issues of disputed fact remain, the court denies the portion of NPF's summary judgment motion pertaining to the Jockey Trailer.

### III. Horses

NPF seeks a declaration that it is the owner of the 32 disputed horses and an order directing Defendants to turn over the remaining living horses. Doc. 170 at ¶¶ 166-172; Doc. 304 at 11 (listing the horses). As noted, NPF purchased or acquired many of those horses, some of

15

which had foals, while others were contributed to NPF at its formation. Doc. 287-1 at ¶¶ 37-53. The court accordingly grants NPF its requested relief, with one caveat: NPF is not entitled to a declaration of ownership as to the three dead horses. Doc. 290 at 17; Doc. 304 at 11 (identifying the dead horses as Desperado Eagle (24), Joey Mercury (25), and Miss Taylors Kiss (26)). Although NPF argues in its summary judgment brief that Aguirre contributed the dead horses to NPF, Doc. 290 at 17, its Local Rule 56.1(a)(3) statement is silent on the matter. Because the argument made in NPF's brief is not evidence, it cannot carry the day. *See Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015) ("[A]ssertions in briefs are not evidence … ."); *In re Morris Paint & Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985) ("Arguments and factual assertions made by counsel in a brief, unsupported by affidavits, cannot be given any weight.").

The court pauses to note that any argument by Aguirre that Schieneman gave her certain horses as "gifts" would necessarily fail. To establish a "gift," the burden is on the alleged donee—here, Aguirre—to prove by "clear and convincing evidence" that the donor intended to make the gift. *See Brenner v. Tr.*, 122 N.E.3d 395, 399 (Ill. App. 2018) (listing this and other requirements to prove a "gift"); *Brackin v. Brackin*, 894 N.E.2d 206, 210-11 (Ind. App. 2008) (same). By failing to press any argument or adduce any evidence on this point, Aguirre has forfeited the issue.

**IV.     Deed to Beecher Ranch**

According to NPF, the deed purporting to convey Beecher Ranch to Rancho El Fenix Inc.—as noted, a company owned by Aguirre—was recorded in violation of Aguirre's fiduciary duty to NPF as its CEO. Doc. 170 at ¶¶ 154-157; Doc. 290 at 34-35; Doc. 304 at 9-10. "[C]ommon law fiduciary duties, similar to the ones imposed on partnerships and closely-held corporations, are applicable to Indiana LLCs." *Purcell v. S. Hills Invs., LLC*, 847 N.E.2d 991, 997 (Ind. App. 2006); *see also id*. at 996 (recognizing that "Indiana LLCs impose a common law

16

fiduciary duty on their officers and members in the absence of contrary provisions in the LLC operating agreements"); *BioConvergence, LLC v. Menefee*, 103 N.E.3d 1141, 1152 (Ind. App. 2018) (holding that the defendant "owed a fiduciary duty to [an LLC member] regardless of whether [the defendant] was acting as CEO or a member of [the] LLC"). Under the business opportunity doctrine, a fiduciary may "not appropriate to h[er] own use a business opportunity that in equity and fairness belongs to the corporation." *DiMaggio v. Rosario*, 950 N.E.2d 1272, 1275 (Ind. App. 2011); *see also McLinden v. Coco*, 765 N.E.2d 606, 615-16 (Ind. App. 2002) ("[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.") (quoting *Kirtley v. McClelland*, 562 N.E.2d 27, 33 (Ind. App. 1990)).

NPF correctly submits that Aguirre usurped from it the opportunity to purchase Beecher Ranch, highlighting her admission that she "never disclosed to NPF Racing's Manager the opportunity to purchase the property, or the purchase itself." Doc. 290 at 34 (quoting Doc. 176 at p. 22, ¶ 52). At the time of Rancho El Fenix Inc.'s purchase of Beecher Ranch, NPF plainly stood to benefit from acquiring it, given that NPF had made various improvements to it and stabled some horses there. The opportunity to buy the ranch therefore belonged to NPF as a matter of "equity and fairness." *DiMaggio*, 950 N.E.2d at 1275. Accordingly, NPF is entitled to a declaration that Rancho El Fenix Inc.'s deed to Beecher Ranch is invalid. *See McLinden*, 765 N.E.2d at 615-16 (recognizing that, if a business opportunity has been usurped, "the corporation

17

may elect to claim all the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired") (quoting *Kirtley*, 562 N.E.2d at 33).

## Conclusion

NPF's motion for partial summary judgment is granted in part and denied in part. The motion is denied without prejudice to renewal, after certain pending discovery matters are resolved, Docs. 310, 323-324, 328, as to ownership of the deceased horses and ownership and possession of the Jockey Trailer. The motion is granted as to ownership and possession of the living horses; the business and leasehold at El Palomino Ranch; the Sooner Horse Trailer; the Chevy truck; various items of personal property described in the APA (listed at Doc. 287-4 at 48); and the commercial ice maker, large television, VIP viewing towers, fencing, cabana, and other improvements that NPF made to El Palomino Ranch. The court also grants NPF's motion for a declaration that Rancho El Fenix Inc.'s deed to Beecher Ranch is void. NPF's motion to appoint a receiver, which it treats as "an alternative or supplementary measure" to its motion for partial summary judgment, Doc. 291 at 2, is denied in part as moot as to the matters for which it is granted summary judgment, and is denied without prejudice in part as to the only remaining disputed asset in existence, the Jockey Trailer.

March 19, 2021

_____
Gary Feinerman
United States District Judge