UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NPF RACING STABLES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 18 C 6216 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| YESENIA G. AGUIRRE, individually and d/b/a Cuadra El Fenix, EL FENIX INC., RANCHO EL FENIX INC., BENJAMIN HERNANDEZ, HECTOR RODRIGUEZ, individually and d/b/a Cuadra La Araña, CARLA LLERENAS, JOSE LUIS DAVILA CAMPOS, JOSE JESUS VALENZUELA, CESAR CANO, and DAVID ARQUIMIDEZ HUICOCHEA-SILVA, d/b/a Adelante Design & Print, | ) | |
| Defendants, | ) | |
| and | ) | |
| YESENIA G. AGUIRRE, | ) | |
| Defendant/Counter-Plaintiff/Third-Party Plaintiff, | ) | |
| vs. | ) | |
| NPF RACING STABLES, LLC, | ) | |
| Counter-Defendant, | ) | |
| and | ) | |
| KARL SCHIENEMAN, | ) | |
| Third-Party Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

NPF Racing Stables, LLC, a horse racing company, brought this diversity suit against

Yesenia Aguirre, El Fenix Inc., Rancho el Fenix Inc., Benjamin Hernandez, Hector Rodriguez,

Carla Llerenas, Jose Luis Davila Campos, Jose Jesus Valenzuela, Cesar Cano, and David

1

Arquimidez Huicochea-Silva. Doc. 170. NPF alleges that Aguirre defrauded, embezzled from, and breached her fiduciary duties to NPF, and that after NPF manager Karl Schieneman terminated her as NPF's CEO and notified her that NPF had bought out her membership in the LLC, she and her co-defendants took possession of, and continued to use and profit from, NPF's horses and equipment. Aguirre brings counterclaims against NPF and third-party claims against Schieneman, alleging that he breached his fiduciary duties to her and that he and NPF violated the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*, and defamed her, and seeking damages and a declaration that the agreement governing her relationship with NPF is void. Doc. 147.

Earlier in the litigation, the court granted NPF's writ of replevin as to two of the horses, a starting gate, a Chevy truck, and a Ford tractor, Docs. 80-81, and that property was replevied in April 2019, Doc. 104. The following month, the court granted NPF's motion for a preliminary injunction as to five horses and certain equipment, prohibiting Defendants from selling, leasing, or encumbering that property or physically removing it from El Palomino Ranch, the venue where NPF conducts its events. Docs. 131-133 (reported at 2019 WL 2327647 (N.D. Ill. May 31, 2019)). The court thereafter denied NPF's and Schieneman's motions to dismiss Aguirre's counterclaims and third-party claims. Docs. 249-250 (reported at 2020 WL 1322847 (N.D. Ill. Mar. 20, 2020)). And the court recently granted summary judgment to NPF on several of its claims. Docs. 333-334 (reported at 2021 WL 1088312 (N.D. Ill. Mar. 19, 2021)).

Now before the court are NPF and Schieneman's motion for summary judgment as to Aguirre's counterclaims and third-party claims. Doc. 317. The motion is granted.

## Background

### A. Aguirre's Noncompliance with Local Rule 56.1(b)(3)

Consistent with the Local Rules, NPF and Schieneman filed and served a Local Rule 56.2 Notice and a Local Rule 56.1(a)(3) statement of undisputed facts along with their summary judgment motion. Docs. 317-1, 317-2. The factual assertions in the Local Rule 56.1(a)(3) statement cite evidentiary material in the record and are supported by the cited material. *See* N.D. Ill. L.R. 56.1(a) ("The statement referred to in (3) shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph."). If Aguirre wished to oppose summary judgment, Local Rule 56.1 required her to file:

> (1) any opposing affidavits and other materials referred to in Fed. R. Civ. P. 56(e); (2) a supporting memorandum of law; and (3) a concise response to the movant's [Local Rule 56.1(a)(3)] statement that shall contain: (A) numbered paragraphs, each corresponding to and stating a concise summary of the paragraph to which it is directed, and (B) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and (C) a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

N.D. Ill. L.R. 56.1(b).

Aguirre did not file anything in response to NPF's and Schieneman's summary judgment motion. Aguirre's *pro se* status does not excuse her from her failure to comply with Local Rule 56.1. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("[W]e have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Zoretic v. Darge*, 832 F.3d 639, 641 (7th Cir. 2016) ("While we liberally construe the pleadings of individuals who proceed pro se, neither appellate

3

courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes.") (internal quotation marks omitted); *Brown v. Wyndemere LLC*, 608 F. App'x 424, 425 (7th Cir. 2015) ("[A] district court is entitled to enforce its local rules, even against *pro se* litigants."). The court therefore deems admitted all material facts that are asserted in NPF and Schieneman's Local Rule 56.1(a)(3) statement and supported by the cited evidentiary materials. *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the [Local Rule 56.1(a)(3)] statement … will be deemed to be admitted unless controverted by the [Local Rule 56.1(b)(3)] statement of the opposing party."); *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 411 (7th Cir. 2019) ("According to well-established Seventh Circuit law, [the nonmovant's] noncompliance [with Local Rule 56.1(b)] meant that the district court could exercise its discretion to accept [the movant's] statements of fact as undisputed."); *Olivet Baptist Church v. Church Mut. Ins. Co.*, 672 F. App'x 607, 607 (7th Cir. 2017) ("The district court treated most of the [movant's] factual submissions as unopposed, because the [nonmovant] failed to contest them in the form required by Local Rule 56.1(b). We have held that the district court is entitled to enforce that rule in precisely the way it enforced the rule in this litigation.") (collecting cases); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by [Local Rule 56.1(b)(3)(B)], those facts are deemed admitted for purposes of the motion.") (internal quotation marks omitted); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("Because of the important function that local rules like [Local] Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules. … [Local] Rule [56.1(b)(3)(B)]

required [the non-movant] to admit or deny each factual statement proffered by [the movant].") (internal quotation marks omitted).

That said, the court is mindful that "a nonmovant's failure to respond to a summary judgment motion, or failure to comply with Local Rule 56.1, does not … automatically result in judgment for the movant. [The movant] must still demonstrate that it is entitled to judgment as a matter of law." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (internal quotation marks omitted). The court therefore will recite the material facts as favorably to Aguirre as the record and Local Rule 56.1 permit. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. v. Chi.*, 916 F.3d 631, 633 (7th Cir. 2019).

### B. Material Facts

The background to this suit is recounted in the court's prior opinions, familiarity with which is assumed. The facts pertinent at the present juncture are as follows.

#### 1. NPF's Formation

In May 2017, Schieneman wired Aguirre $157,500 so that she could purchase a female racehorse, "Shes Da One on Fire," which was intended to be the first acquisition of the horse racing business—NPF Racing Stables, LLC—that the pair formed months later. Doc. 317-2 at ¶¶ 6, 22. The same month, Schieneman paid Aguirre $20,500 for a vehicle, which she later returned due to a defective transmission. *Id*. at ¶ 22. In late June 2017, Aguirre texted Schieneman that the horse she purchased with Schieneman's money had died. *Id*. at ¶ 8. When Schieneman asked Aguirre to provide him with the horse's paperwork, she told him not to investigate and gave him the name of a different, less valuable horse that also had died. *Id*. at ¶¶ 9-10. In August and September 2017, Schieneman provided Aguirre with funds to buy

5

another horse, "Switch to a Corona," and a Chevy Silverado truck. *Id*. at ¶¶ 14, 16. The pair agreed that both assets were to be contributed to NPF. *Ibid*. At no point did Schieneman agree to enter into a separate, "oral partnership" with Aguirre. *Id*. at ¶ 22.

NPF was formed on August 24, 2017. *Id*. at ¶ 23. Attorney Daniel Blaney established the company as a manager-managed LLC under Indiana law, with Schieneman serving as the manager and a member, and Aguirre serving as the only other member. *Id*. at ¶¶ 2-3, 23. Months earlier, Aguirre told Schieneman that the horses at El Palomino Ranch belonged to Valenzuela (now her co-defendant) and that Valenzuela had put certain horses in Aguirre's name to hide them from Valenzuela's wife. *Id*. at ¶ 18. But a month after NPF's formation, on September 23, Aguirre told Schieneman that Valenzuela had donated several valuable horses to her after divorcing his wife. *Ibid*. Aguirre convinced Schieneman and NPF to accept the horses and pay for their care, explaining that she could not afford to do so herself. *Id*. at ¶ 19. In fact, Aguirre fabricated the story about Valenzuela and the horses—Valenzuela was neither married nor divorced, and he did not donate his valuable horses to Aguirre, but rather sold, or agreed to sell, them to her. *Id*. at ¶¶ 20-21.

Oblivious to Aguirre's falsehoods, Schieneman arranged for him and Aguirre to meet with Blaney on October 9, 2017 to discuss the creation of an operating agreement for NPF that would put the horses under the company's charge. *Id*. at ¶¶ 19, 24. During the meeting, Blaney confirmed that Aguirre would contribute to NPF in the form of horses and sweat equity, and that Schieneman would contribute in the form of monetary investment and financial management. *Id*. at ¶ 24. Blaney explained Schieneman's authority as manager and counseled the pair on their respective duties. *Ibid*. Schieneman did not ever serve as Aguirre's personal attorney for any matter related to NPF, horses, or otherwise. *Id*. at ¶ 25.

Days later, on October 25, Aguirre and Schieneman entered into NPF's Limited Liability Company Agreement ("Operating Agreement"). *Id*. at ¶ 27. Aguirre signed the Operating Agreement without reading it, and without any pressure or deadline from Schieneman. *Id*. at ¶¶ 27, 31. In pertinent part, the Operating Agreement appointed Aguirre as the company's CEO, vested exclusive managerial authority in Schieneman as the manager, and provided that all assets—including the horses that Aguirre contributed—were the property of NPF rather than that of any individual member of the LLC. *Id*. at ¶¶ 3, 19, 27, 29.

### 2. Aguirre's Tenure as NPF's CEO

Aguirre repeatedly placed her own personal interests ahead of NPF's and embezzled NPF funds throughout her tenure as CEO. *Id*. at ¶¶ 12, 17, 33-36, 38-41. Aguirre registered several company assets, including Switch to a Corona and the Chevy Silverado, in her own name. *Id*. at ¶¶ 12, 17, 33, 38-39, 41 (detailing those assets). She spent thousands of dollars of NPF funds on personal expenses such as clothing and air travel for her family. *Id*. at ¶ 34. Aguirre wrote checks to herself and made scores of unauthorized cash withdrawals from NPF's account, totaling approximately $100,000. *Id*. at ¶ 35. She also transferred NPF's funds and other assets to third parties without any legitimate business justification. *Id*. at ¶ 40. For example, Aguirre transferred several valuable NPF horses without consideration; used NPF funds to pay for the veterinary and race registration fees of horses that NPF did not own; and used NPF funds to record a deed to Beecher Ranch in the name of her own horse racing company, Rancho El Fenix Inc. *Ibid*.

Aguirre did not receive a salary for her work as CEO. *Id*. at ¶ 37. In December 2017, Schieneman asked Aguirre for the information necessary to set up a payroll for NPF's contract employees, but Aguirre said that she would pay them in cash, explaining that "it actually saves

you from doing a payroll and paying the fees needed." *Ibid*. (quoting Doc. 317-15 at p. 6, ¶ 14). Near the end of April 2018, Schieneman agreed on NPF's behalf to eventually pay both Aguirre and himself a salary, but only after NPF turned a profit and Aguirre provided him with the information needed to hire employees and set up a payroll. *Ibid*. Aguirre never gave him that information, and at no point did Schieneman agree to pay her $800 per week. *Ibid*.

NPF acquired the business and leasehold assets at El Palomino Ranch in early August 2018. *Id*. at ¶ 42. Less than two weeks later, on August 15, Aguirre told Schieneman that her company El Fenix Inc.—and not NPF—had the exclusive right to hold events at El Palomino Ranch. *Ibid*. Schieneman terminated Aguirre as NPF's CEO that day. *Ibid*. His decision to fire Aguirre was also based on her many unauthorized withdrawals from NPF's bank account. *Ibid*. After noticing those expenditures, Schieneman transferred funds out of the bank account to protect the company. *Ibid*. By letter dated September 7, 2018, NPF notified Aguirre that it had elected to purchase her membership interest "for cause," including her unauthorized expenditures and competition with NPF. *Id*. at ¶ 43. Aguirre thereafter ousted NPF from El Palomino Ranch and continued to race horses that belonged to NPF. *Id*. at ¶¶ 42-43, 45, 52.

### 3. Schieneman's Posts about Aguirre on NPF's Website

After the pair fell out and NPF brought this suit, Schieneman made numerous posts about Aguirre on NPF's website, npfracingllc.com. *Id*. at ¶ 52. Aguirre's counterclaim and third-party claim alleges that six statements or passages are "false and defamatory." Doc. 147 at ¶¶ 90-91. They are: (1) a section entitled "The great lie," which states that Aguirre "lied" to Schieneman about the ownership of her horses; (2) "Here is an example of two great lies [made by Aquirre [sic]] that we have discovered"; (3) "The second lie [made by Aquirre [sic]] was huge. It caused us to start NPF together. …"; (4) "[R]ead the detail Yesenia Aguirre used in her

8

lies to me about her the [sic] divorce which left her needing my sudden investment in her horses. Of course none of this is true except she needed money badly"; (5) "[W]e are sure that the record in the litigation shows many lies and actions of self-negotiation that our former President Yesenia Aguirre performed. … [R]acing horses that do not belong to her, eliminating NPF from El Palomino, and ignoring the rights of NPF in the assets for which I contributed all the money and these are only some of the examples"; and (6) "[T]wo months after the ranch [was] bought[,] the business relationship and personal relationship ended[,] and NPF sued Yesenia Aguirre for numerous behaviors of self-dealing and mismanagement which continues until now while she races horses that do not belong to the Ranch that she did not contribute any money to." *Id.* at ¶ 90 (alterations in original).

Given the facts recounted above, the challenged posts are substantially accurate. Doc. 317-2 at ¶ 52.

## Discussion

Aguirre seeks a declaration against NPF and Schieneman that the Operating Agreement is void, damages and equitable relief against Schieneman for breach of fiduciary duty, and damages against Schieneman and NPF for IWPCA violations and defamation. Doc. 147 at ¶¶ 93-119.

### I.    Declaratory Judgment Claim

Based on the allegation that Schieneman breached his fiduciary duties to her as her lawyer and business partner in connection with their entry into the Operating Agreement, Aguirre seeks a declaration that the agreement is unenforceable and void. *Id*. at ¶¶ 93-100. Aguirre's claim rests on her allegations that she was "never advised to seek counsel" and "never received advice" as to the agreement, such that she "did not understand that it purportedly would give exorbitant, one-sided powers to Schieneman." *Id*. at ¶ 95.

9

"Where … a fiduciary relationship exists and where the dominant party benefits from execution of the document by the subservient party, a presumption of invalidity arises." *Prueter v. Bork*, 435 N.E.2d 109, 112-13 (Ill. App. 1981). NPF and Schieneman argue that Aguirre's declaratory judgment claim fails because the record would not allow a reasonable jury to find that he owed her a fiduciary duty, either as her attorney or her business partner. Doc. 320 at 19-22.

True enough, "the existence of an attorney-client relationship creates a fiduciary relationship between those parties as a matter of law." *In re Imming*, 545 N.E.2d 715, 721 (Ill. 1989). But "[t]o form an attorney-client relationship, both the attorney and the client must consent to its formation," with "[c]onsent [being either] express or implied." *Meriturn Partners, LLC v. Banner & Witcoff, Ltd.*, 31 N.E.3d 451, 455-56 (Ill. App. 2015); *see also id*. at 456 ("A client cannot unilaterally create the relationship, and the putative client's belief that the attorney is representing him is only one consideration."). Here, the record indisputably shows that Schieneman "did not ever serve as Aguirre's personal attorney for any matter related to NPF, horses, or otherwise." Doc. 317-15 at p. 4, ¶ 7. Aguirre has therefore failed to satisfy her burden to show that Schieneman owed her a fiduciary duty as her attorney at any point, including when they entered into the Operating Agreement.

Aguirre's theory that Schieneman owed her a fiduciary duty as her business partner, Doc. 147 at ¶¶ 19-24, rests on the complaint's allegation that Schieneman was her business partner as of the Operating Agreement's signing in light of an "oral business partnership" in place between them from December 2016 until at least October 2017, *id*. at ¶ 24. "The requisites of a partnership are that the parties must have joined together to carry on a trade or venture for their

10

common benefit, each contributing property or services, and having a community of interest in the profits." *Seidmon v. Harris*, 526 N.E.2d 543, 545 (Ill. App. 1988).

Aguirre's claim that an oral partnership was in place fails because the record indisputably shows that Schieneman never agreed to form a partnership and that he and Aguirre did not share any partnership assets (and thus no profits) at the time they executed the Operating Agreement in October 2017. Doc. 317-2 at ¶ 22. The assets the pair acquired in May 2017 had either died (the horse named Shes Da One on Fire) or been returned (the vehicle). *Ibid*. And the assets Schieneman purchased in August 2017 (the horse named Switch to a Corona) and September 2017 (the Chevy Silverado) were expressly contributed to NPF rather than to any purported partnership between him and Aguirre. *Id*. at ¶¶ 14, 16.

Accordingly, Aguirre's declaratory judgment claim fails because Schieneman did not owe her a fiduciary duty when they executed the Operating Agreement.

**II.     Breach of Fiduciary Duty Claim**

Aguirre seeks damages for various alleged breaches of fiduciary duties by Schieneman, whom she contends owed her fiduciary duties as her attorney, her business partner, NPF's manager, and NPF member. Doc. 147 at ¶¶ 101-105. The alleged breaches fall into three categories. The first concerns changes made to the parties' purported oral partnership through the Operating Agreement. *Id*. at ¶ 103(a)-(c), (e)-(f), & (i)-(l). The second concerns Schieneman's management of NPF—namely, his choice to restrict Aguirre's access to company funds, terminate her as CEO, and repurchase her membership interest. *Id*. at ¶ 103(d), (g). And the third concerns Schieneman's recognition of El Fenix Inc. as "landlord" of El Palomino Ranch in what she calls the "Phony Lease." *Id*. at ¶ 103(h).

"To recover for a breach of fiduciary duty, Illinois law require[s] the plaintiff[] to establish the existence of a fiduciary duty, a breach of that duty, and damages proximately

caused by the breach." *Alonso v. Weiss*, 932 F.3d 995, 1001 (7th Cir. 2019); *see also Jaffri v. JPMorgan Chase Bank, N.A.*, 26 N.E.3d 635, 639 (Ind. App. 2015) (Indiana law) ("A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary.") (quoting *Farmers Elevator Co. of Oakville v. Hamilton*, 926 N.E.2d 68, 79 (Ind. App. 2010)). Aguirre's first category of breaches is premised on the fiduciary duties Schieneman purportedly owed her as her lawyer and business partner. As discussed above, Schieneman was neither, so those aspects of Aguirre's claim fail.

As to the second category, Schieneman does not deny that he owed Aguirre, a fellow member of NPF, a fiduciary duty in his capacity as a member and the manager of NPF. Doc. 320 at 25-26. Nonetheless, Schieneman correctly contends that he did not breach that duty while operating the company because the record indisputably shows that his actions were in the company's best interests. *See Rapkin Grp., Inc. v. Cardinal Ventures, Inc.*, 29 N.E.3d 752, 757-58 (Ind. App. 2015) (recognizing that a breach of fiduciary duty occurs when an LLC officer or member fails "to deal fairly, honestly, and openly" with the company and its members on account of his "personal interests"); *cf. Galligan v. Galligan*, 714 N.E.2d 1217, 1228 (Ind. App. 2001) (observing that a majority shareholder may "breach his duties as a fiduciary by failing to act in the best interests of the shareholders and the corporation"). Schieneman fired Aguirre as NPF's CEO and caused NPF to repurchase her membership interest after she took the position that *her* company, El Fenix Inc., had the exclusive right to operate El Palomino Ranch, and in response to her embezzlement from NPF. Doc. 317-2 at ¶¶ 42-43. Aguirre's embezzlement also justified Schieneman's restriction of her access to NPF's funds. *Id*. at ¶ 42.

12

As to the third category, Schieneman's efforts to have El Fenix Inc. recognized as El Palomino Ranch's "landlord," Aguirre fails to show how those actions could constitute a breach as to *her*. Moreover, documenting the leasehold that NPF had acquired furthered the company's interests, so there was no breach in any event.

In sum, Aguirre's breach of fiduciary duty claim does not withstand summary judgment.

### III.   IWPCA Claim

Aguirre seeks allegedly unpaid wages and final compensation from both NPF and Schieneman, each of whom she submits was her "employer" for purposes of the IWPCA. Doc. 147 at ¶¶ 106-114. The IWPCA claim rests on the complaint's allegations that Aguirre and Schieneman agreed (at some unspecified time) that NPF would pay her $800 per week to work eight hours per day, that she in fact worked for NPF at least eight hours per day, but that NPF, at Schieneman's direction, declined to pay her the agreed-upon salary. *Id*. at ¶¶ 47, 110-113. NPF and Schieneman seek summary judgment on the ground that Aguirre is not owed any unpaid wages, and that Aguirre in any event forfeited her wage claim by continuously breaching her fiduciary duties throughout her tenure as NPF's CEO. Doc. 320 at 27-28. Summary judgment is warranted on both grounds.

First, the record indisputably shows that Aguirre was not entitled to any unpaid wages. *Id*. at 28. The IWPCA requires an employer "at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period." 820 ILCS 115/3. "The Act defines 'wages' narrowly—a wage is 'compensation owed an employee *by an employer pursuant to an employment contract or agreement* between the 2 parties. …" *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016) (quoting 820 ILCS 115/2). Although "[a]n employment agreement need not be a formally negotiated contract," the employee must

13

demonstrate "mutual assent to terms that support the recovery" sought. *Landers-Scelfo v. Corp. Office Sys., Inc.*, 827 N.E.2d 1051, 1059-60 (Ill. App. 2005).

Aguirre has failed to satisfy that burden. Contrary to the complaint's allegations, NPF never agreed to pay Aguirre a salary of $800 per week. Doc. 317-2 at ¶ 37. All the evidence shows is that Schieneman, toward the end of April 2018, agreed on NPF's behalf to *eventually* pay them both a salary, but only after (1) NPF generated profits from horse racing operations and (2) Aguirre provided him with the information needed to hire employees and set up a payroll. *Ibid*. Because neither contingency occurred, any claim for unpaid wages (let alone for $800 per week) fails for lack of "mutual assent." *Landers-Scelfo*, 827 N.E.2d at 1059-60.

In any event, Aguirre forfeited her wage claim by deliberately breaching her fiduciary duty to NPF while she served as its CEO. Doc. 320 at 27-28. Illinois law holds that, "as a matter of public policy, a willful and deliberate breach of a fiduciary duty requires complete forfeiture of all compensation during the period of the breach." *Flynn v. Maschmeyer*, 156 N.E.3d 540, 560-61 (Ill. App. 2020) (internal quotation marks omitted). The record establishes that Aguirre withdrew approximately $100,000 in NPF funds without authorization and with no legitimate business purpose, Doc. 317-2 at ¶ 35; registered company assets in her own name, *id*. at ¶¶ 12, 17, 33, 38-39, 41; and transferred NPF funds and other assets to third parties—including her own company, Rancho El Fenix Inc.—with no business justification, *id*. at ¶ 40. Those actions qualify as breaches of fiduciary duty under Illinois law. *See C.O.A.L., Inc. v. Dana Hotel, LLC*, 82 N.E.3d 1262, 1284 (Ill. App. 2017) (holding that the plaintiff stated a fiduciary duty claim by alleging that the defendant "diverted funds from the LLC into [the] defendant's accounts"); *Witters v. Hicks*, 780 N.E.2d 713, 720 (Ill. App. 2002) (holding that a company director's deployment of business resources for his own company's use "clearly

14

constitute[d] oppressive activity and a breach of his fiduciary duties"). The record further establishes that Aguirre's breach extended throughout her tenure as CEO, with the result that her wage claim is subject to complete forfeiture. *See Russell Dean, Inc. v. Maher*, 2018 WL 4679573, at *11 (N.D. Ill. Sept. 28, 2018) (holding that an employee's breach of his fiduciary duty to the company entitled his employer to recover all wages paid to him during the period of the breach).

In sum, NPF and Schieneman are entitled to summary judgment on the IWPCA claim.

## IV. Defamation Claim

Aguirre alleges that NPF and Schieneman made defamatory *per se* posts on NPF's website that "disparage [her] in her trade or business and accuse her of unethical and dishonest behavior." Doc. 147 at ¶¶ 115-119. As noted, Aguirre focuses on six statements or passages on the website. *Id*. at ¶ 90. "To prove defamation, a plaintiff must show that the defendant made a false statement about the plaintiff, there was an unprivileged publication to a third party by the defendant, and the publication damaged the plaintiff." *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 698 (7th Cir. 2006) (quoting *Popko v. Cont'l Cas. Co.*, 823 N.E.2d 184, 188 (Ill. App. 2005)). Focusing on the first element, NPF and Schieneman correctly argue that Aguirre's defamation claim necessarily fails because, on the present record, none of the statements is false. Doc. 320 at 29-30.

Under Illinois law, "a statement is not actionable [as defamatory] unless it is factual and *false*." *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1024 (Ill. 2008); *see also Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572 (7th Cir. 2017) ("A cornerstone of a defamation claim under Indiana law is the falsity of any alleged defamatory statement."). Certain of the allegedly defamatory statements or passages do no more than refer generally to Aguirre as a "liar" or as having "lied," and thus cannot ground a defamation claim. *See Piersall*

*v. SportsVision of Chi.*, 595 N.E.2d 103, 107 (Ill. App. 1992) ("[T]he general statement that someone is a liar, not being put in context of specific facts, is merely opinion."); *see also Dubinsky v. United Airlines Master Exec. Council*, 708 N.E.2d 441, 451 (Ill. App. 1999) (holding that the "statement that [the plaintiff] was a 'crook' was not actionable because it was not made in any specific factual context"). As for the remaining statements and passages, Schieneman and NPF contend that they are "substantially true." Doc. 320 at 29-30; *see Seitz-Partridge v. Loyola Univ. of Chi.*, 987 N.E.2d 34, 41 (Ill. App. 2013) ("Truth is an absolute defense to defamation[,] and … only 'substantial truth' is required for this defense.") (some internal quotation marks omitted). Schieneman and NPF are correct, as the record evidence indisputably shows that Aguirre in fact: (1) lied about the ownership of certain horses, Doc. 317-2 at ¶¶ 18, 21, 45, 49-52; (2) lied to Schieneman about Valenzuela's divorce (from a non-existent wife) in order to solicit financial support from him, *id*. at ¶¶ 18-21, 52; (3) usurped NPF's assets and ousted it from El Palomino Ranch, *id*. at ¶¶ 16-17, 42-43, 45, 52; and (4) raced NPF horses that did not belong to her, *id*. at ¶¶ 42-43, 45, 52. Because "true statements cannot support a claim of defamation," Aguirre's defamation claim fails. *Seitz-Partridge*, 987 N.E.2d at 41.

## Conclusion

NPF's and Schieneman's motion for summary judgment on Aguirre's counterclaims and third-party claims is granted.

April 12, 2021

_____
United States District Judge